# EXHIBIT 42

1            UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3                         ---

4  JULIA BERNSTEIN, LISA MARIE SMITH,
   and ESTHER GARCIA, on behalf of
5  themselves and all others similarly
   situated,
6
             Plaintiffs,
7                                       CLASS ACTION
        vs.
8                                       Case No.
                                        3:15-cv-02277-JST
9  VIRGIN AMERICA, INC.;
   and Does 1 -10, inclusive,
10
             Defendants.
11  ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

12

13

14

15         DEPOSITION OF VALENTIN ESTEVEZ, Ph.D.

16            San Francisco, California

17             September 15, 2016

18

19

20

21

22  REPORTED BY:

23  ALESIA L. COLLINS

24  CSR No. 7751, CLR

25  Job No.: 10027241

Valentin Estevez, Ph.D.                    Bernstein, et al. vs. Virgin America, Inc.

1    text file?

2        A    Yes.   This PDF, it was feasible to go that

3    route.

4        Q    And then the text file, you then said -- I

5    believe you said there were two steps to get the text

6    file -- to write the computer script and get the text

7    files into usable format.   Can you describe that for me.

8        A    Yes.   Because the first thing, if we look at

9    Exhibit 3A in my report, which is the best way.   So, the

10   first step is just to take AIMS as it looks here, as a

11   page in a PDF, and then put that as a text file.   So, it

12   will look exactly the same, except for maybe the lines

13   and the boxes around.   So, we just take that data.   Now

14   we have the same looking file, but now it's a text file.

15           So, using the data, for example, for AIMS, it's

16   in a columnar layout, so now we have -- we look at the

17   data to understand, well, what are these pieces of

18   information, what is the first line, what is the second

19   line, third line, so on and so forth.

20           Once we have an understanding of what each

21   piece is, then we write a computer script to say, okay,

22   take this piece, put it here, take this piece, put it

23   there, until we basically take this information into the

24   format that would be more efficient to analyze.

25       Q    Okay.   And then, what computer program were you

1  using to plug the text file data into?

2          MR. HENDRICKS:  Vague and ambiguous.

3          THE WITNESS:  From PDF to text file, or text

4  file to --

5          MS. OLIVIER:  Q.  I think I understand from PDF

6  to text file, you used --

7      A   OCR.

8      Q   -- OCR.  And then, once you have it in text

9  format, what is the program that you used to plug it in

10  to analyze?

11     A   Microsoft Visual Basic was used to extract the

12  information into a text file, and then I used Stata to

13  -- once I have that data, then I use Stata to actually

14  read it and start processing it prior to my analysis.

15     Q   And, did you also use Stata for the CrewTrac

16  data?

17     A   Yes.

18     Q   Okay.  And for the CrewTrac data, you -- that

19  -- that data was given to you in text file format,

20  correct?

21     A   Yes.

22     Q   And, so, you did not have to do the first step

23  of converting from PDF to text, correct?

24     A   Exactly.

25     Q   And so, then, Exhibit 3B, is this an example of

1   the CrewTrac data that you were provided?

2        A   Yes.

3        Q   And, did the format for the CrewTrac data for

4   all of the plaintiffs have -- did it look like this, did

5   it have the same format?

6        A   Yes.  It looks basically the same, with

7   variations month to month, plaintiff to plaintiff,

8   depending on how much they worked and what activities

9   were reflected in CrewTrac.  The basic layout is the

10  same.

11       Q   Basic layout is the same, columns would be the

12  same, and the different codes that are on here would be

13  -- and not the specific codes for the flight, because I

14  understand that's different, but the headers of the

15  various columns would be the same; is that correct?

16       A   Yes.  To the best of my recollection, because

17  obviously there were thousands and thousands of lines.

18  And, even when you do this type of computerized

19  processing of data, every now and then you -- you ran

20  into a situation where you need to actually look at the

21  record to see, well, maybe there's a typo, or a

22  character is slightly off center.  So -- but in general,

23  we stay with the -- in general, they look the same for

24  every plaintiff, every month, yes.

25       Q   Got it.  And, how would you know if something is

**Valentin Estevez, Ph.D.**                    **Bernstein, et al. vs. Virgin America, Inc.**

1        THE WITNESS:  Not -- not -- not exactly correct

2   what you just said.  I didn't have to convert it to a

3   PDF.

4        MS. OLIVIER:  Q.  Yes.

5       A    But I still have to write a script in Stata --

6   script or program -- to again take the pieces that I

7   want.  After I saw the data and understood what each

8   component of the data was, and then I took each piece,

9   and I collected it into -- put it into the columns that

10  I want.  But, you have to write a computer script --

11      Q    Right.

12      A    -- to get information from the report into

13  something that you can actually analyze.

14      Q    Okay.  And, when you say "the report," what are

15  you --

16      A    These are the CrewTrac reports.  These are

17  reports.

18      Q    They're records that were provided to you by

19  Virgin's counsel; is that correct?

20      A    Yes.

21      Q    Okay.  And, so, were you successful in

22  converting and then importing the data from the AIMS

23  system ultimately into Stata in order to analyze it?

24      A    We were able to collect information we wanted,

25  yes.

**Valentin Estevez, Ph.D.**                    **Bernstein, et al. vs. Virgin America, Inc.**

1   Breshears, that map, those three letter codes, or four

2   letter codes into a description, so I could determine

3   RSA -- I don't think RSA is actually reserved.  But,

4   basically, that was -- that's how I learned, by looking

5   at the data.

6          And then, Mr. Breshears, in his production, had

7   some very useful documents that would map each potential

8   non-flight activity into a description that would allow

9   me to say, is it work, is it, for example, vacation, as

10  we saw with AIMS, and things of that sort.

11  **     Q    Okay.  And, so, basically any time a flight**

12  **attendant in -- in a particular day, there would be a**

13  **code that would correspond -- in a general manner**

14  **correspond to the activity that they were doing during**

15  **that workday; is that correct?**

16          MR. HENDRICKS:  Vague and ambiguous.

17          You may answer.

18          THE WITNESS:  That's my reading of the data, is

19  that CrewTrac and AIMS were keeping track of either when

20  they were flying, when they were attending courses, or

21  being on company business, being on vacation.  So,

22  that's my understanding from looking at the data.

23          MS. OLIVIER:  Q.  Okay.  So, then further on,

24  on page two, you say that the -- "the AIMS data does not

25  reflect any "report" time."

**Page 44**

1         Can you tell me how you're defining "report"

2    time in the report.

3      A    "Report" time, my understanding is that

4    in-flight team members need to be at the airport or at

5    their flight, you know, before -- a certain time before

6    the flight is supposed to depart.

7         I was looking at the data to see is it

8    reflected anywhere when the flight attendant or

9    in-flight team member reported for the flight.

10         By looking at AIMS, the only times that I see

11   there are actual arrival and departure times for the

12   flights.  And for the cases of non-flight activities,

13   what I -- what I believe are scheduled start and end

14   times.

15         In CrewTrac, there is -- you know, if you look

16   at the -- at the CrewTrac report, it's actually a line

17   that says "Report," and it has a field next to it that

18   looks like a time.

19         If you look at that field, and you compare that

20   to the scheduled departure time of the first flight for

21   the day, you can see that it's always one hour before

22   the scheduled departure time for the first flight of the

23   day.

24         So, that's how I determined that that "Report,"

25   and field after the word "Report," was the, I guess,

1  scheduled or intended report time.  Because, as I said,

2  if you look at the -- the different records, several

3  thousand records that we have here --

4       **Q   Yes.**

5       A   -- that "Report" field is usually exactly one

6  hour before the scheduled departure time.

7       **Q   And, that's consistent through all the records**

8  **that you looked at in CrewTrac, correct?**

9       A   To the best of my recollection, yes.

10      **Q   So, you also note in your report that the AIMS**

11 **data does not reflect any scheduled time, but it does**

12 **reflect actual time, correct?**

13      A   Yes.

14      **Q   And, if the goal is to calculate the actual time**

15 **of the flights, and the time in between the flights, is**

16 **-- is it useful to have a scheduled time?**

17          MR. HENDRICKS:  Incomplete hypothetical.

18 Outside the scope of the designation.  Lacks foundation.

19 Vague and ambiguous as to "helpful."

20          You may answer.

21          THE WITNESS:  I didn't need the scheduled times

22 for my calculations.

23          MS. OLIVIER:  Q.  You did not need any of the

24 scheduled times for your calculations?

25      A   No.  Not for the calculations I was asked to do

Valentin Estevez, Ph.D.                                  **Bernstein, et al. vs. Virgin America, Inc.**

1      THE WITNESS:  My understanding is that AIMS

2  shows the actual departure and arrival time for flights

3  and scheduled times for non-flight activity.  Yes,

4  that's my understanding.

5      MS. OLIVIER:  Q.  Okay.  You also state that,

6  "AIMS shows flight and non-flight activities in a single

7  block."  Can you explain to me what you mean by that.

8      A   Let's go back to 3A.  You see that here's

9  everything.  Flight and non-flight is referred by date,

10  each block or column is a date.

11      **Q   Yep.**

12      A   Some of these records are flight worked, some of

13  those are actually non-flight activities.  If you look

14  at CrewTrac, CrewTrac is different.  The top part of the

15  CrewTrac report tells you all this.  I think it tells

16  you some general information about the period when it

17  started and ended.  Also indicates on this particular

18  date there was something that is not a flight.  Then the

19  actual detailed flight information is in the second part

20  of the report.

21      **Q   Uh-huh.**

22      A   That's what I mean by AIMS is a single block,

23  but has everything.  CrewTrac has -- we call it

24  internally the "header" or "daily" part, and the body,

25  we call it the "flight" part --

Valentin Estevez, Ph.D.                                    Bernstein, et al. vs. Virgin America, Inc.

1    Q    Okay.

2    A    -- of CrewTrac.

3    Q    And you were still able, despite the fact that

4    the flight and non-flight activity is contained in the

5    single block, to segregate that data for your purposes,

6    correct?

7    A    Yes.

8    Q    When, to your understanding, did Virgin stop

9    using the AIMS system and start using CrewTrac?

10   A    My understanding is that around October of 2011,

11   CrewTrac went live, and that's -- I think from that

12   point forward CrewTrac became the system that they used

13   to track this type of information.

14   Q    And, has -- do you have any understanding of

15   whether CrewTrac is the system that Virgin continues to

16   use today?

17   A    No, because my last records are from February of

18   this year.

19   Q    Okay.  So, the flight data after October 2011,

20   and the set that you analyzed for the plaintiff, was all

21   data that was contained in CrewTrac, correct?

22   A    Yes.

23   Q    So, that was a period of five-and-a-half years;

24   is that right?

25   A    Let's see...  Twelve, 13, 14, 15, and three

1   calling it an edited record.  It was a scheduled pairing

2   or assignment, and the employee, the flight attendant or

3   the company initiated a swap, and then you have

4   something different in the end.

5        Q    And, do you have an understanding of how the

6   swap impacts the actual hours that are recorded in

7   CrewTrac?

8        A    No.

9        Q    Okay.  So, going to the next section on that

10  same page.

11       A    Uh-huh.

12       Q    California hours for the named plaintiffs.

13       A    Uh-huh.

14       Q    What were you asked to do with respect to this

15  segment of your report?

16       A    This particular part -- segment of the report,

17  what I do is, I already put together the AIMS and

18  CrewTrac data for the plaintiffs, and then my task here

19  was to perform the calculations requested under a series

20  of assumptions that I was given.

21       Q    Okay.  And, so, you have these assumptions, one

22  through four, that are at the bottom of page eight and

23  the top of page nine.  And, who provided you with those

24  assumptions?

25       A    Counsel for defendants.

**Valentin Estevez, Ph.D.**                    **Bernstein, et al. vs. Virgin America, Inc.**

1     Q    And, were you given any documentary -- any

2    documents that support these -- not -- not

3    communications with counsel, but any documents from

4    Virgin America that support any of the assumptions that

5    you see here?

6     A    No.

7     Q    Okay.

8          MR. HENDRICKS:  Belatedly, vague and ambiguous,

9    but that's fine.

10          MS. OLIVIER:  Q.  So, in table one -- this

11    appears to be a table of the three plaintiffs.  In the

12    column it has their ID, employee ID number, their name,

13    a column called "All," a column called "In California,"

14    and then a column called "PCT," which I assume means

15    percentage.  Is that correct?

16     A    Yes.

17     Q    And, so, how did you -- how did you get the --

18    the numbers that are indicated in the "All" column?  How

19    do you calculate those?

20     A    Well, as I specified in my report, the "All" --

21    the all total potential hours worked, and the sum of the

22    block time, including block time in deadhead flights,

23    same day travel time, which is another non-flight record

24    that you can find in CrewTrac, and then the time spent

25    in categories one through four above, but without any

Valentin Estevez, Ph.D.                    Bernstein, et al. vs. Virgin America, Inc.

1    restrictions with regard to the state.

2          So, it's basically block time, plus categories

3    one through four in any airport, any state -- more like

4    any airport, any state.  That's the column "All."

5          The column "In California," are categories one

6    through four, you know, activities that take place in

7    California under those parameters.  It's a subset of the

8    first column.  And, the third column is just the ratio

9    of the potential hours in California to potential total

10   hours.

11        Q    Okay.  And when you say "potential hours," what

12   do you mean by that?

13        A    The "potential" comes from the fact that the

14   non-ground activities, I don't have actual times.  I

15   only have scheduled, you know, start and end times of

16   training, whether reserve, or so on and so forth.

17        Q    Non-flight activities?

18        A    Yes.

19        Q    And, the records do reflect the actual time for

20   flight duties, correct?

21        A    For block time.

22        Q    Block time?

23        A    In block time.  You have to compute it in the

24   AIMS, because AIMS doesn't have the block time computed.

25   CrewTrac does have block time computed.

Valentin Estevez, Ph.D.                     Bernstein, et al. vs. Virgin America, Inc.

1      Q     And, they -- but they were all done in Stata?

2      A     All done in Stata.

3      Q     Okay.  And they were done using all of the data

4   that you provided for the plaintiff?

5      A     Yes.  The production I have given you through

6   counsel takes you from the raw data all the way through

7   this calculation.  There is a file in the end that you

8   can see, you know, what creates the file, which program

9   creates the files, and all these numbers.

10     Q     Got it.  So, for all of the California -- sorry.

11  All of the calculations you performed relating to

12  California versus non-California time, you assumed that

13  any time that a flight attendant was on a plane during

14  block time at an airport was not California time,

15  correct?

16     A     Block --

17          MR. HENDRICKS:  Vague and ambiguous.  You may

18  answer.

19          THE WITNESS:  Block time is not considered time

20  in California.

21          MS. OLIVIER:  Q.  And, why is that?

22     A     That's an assumption that was given to me by

23  counsel for defendant.

24     Q     So, you could have -- so under your analysis,

25  you could have a flight attendant who is on a plane at

1   SFO, and the wheels have pushed back, so they're now in

2   block time, and that time is not California time; is

3   that correct?

4       A   Yes.

5       Q   And, do you think that's a reasonable assumption

6   to make?

7           MR. HENDRICKS:  Objection.  Calls for legal

8   conclusion.  Lacks foundation.  Argumentative as framed.

9           MS. OLIVIER:  Q.  You may answer.

10          MR. HENDRICKS:  You may answer.

11          THE WITNESS:  Okay.  What do you mean by

12  "reasonable"?

13          MS. OLIVIER:  Q.  I mean, does it seem

14  reasonable to you that a plane that is on the ground in

15  California is considered not in California?

16          MR. HENDRICKS:  I'm going to -- I'm going to

17  also object -- I'm going to go one step further than

18  that.  I think that's a legal contention question.  It

19  is -- as you know, Counsel, that's an issue that we will

20  be litigating.  Calls for legal opinion, legal

21  contention.  The question, as framed, is not relevant.

22  I instruct the witness not to answer on the ground it's

23  a legal question.

24          MS. OLIVIER:  I'm not asking for a legal

25  contention.

1   him, we can provide a copy -- further copy of that to

2   you today.

3          MS. OLIVIER:  Thank you, Counsel.

4      Q   I'm sorry.  Was there something further?

5      A   No.

6      Q   Okay.

7      A   I don't think so.

8      Q   Okay.  So, looking at table one, just taking

9   Lisa Marie Smith.  You have all -- all of her hours, and

10  then her hours in California.  And, again, you're

11  exempting from your definition of "all" hours, block

12  time; is that correct?

13     A   "All" hours, no.

14     Q   You're including block time in "all" hours?

15     A   Yeah.  See that in the paragraph right after

16  point four?  Total potential hours worked by the

17  plaintiffs as the sum of block time, including block

18  time in deadhead flights, same day travel, and the time

19  spent in categories one through four in any airport.

20     Q   So, then -- and, I apologize.  I think I'm just

21  not understanding how you did the calculations.

22          When you look at the "In California" column, so

23  for Lisa Marie Smith, the value that's stated is 799.4.

24  I assume that's the number of -- that's your conclusion

25  as to the total number -- total number of potential

1    hours worked in California; is that correct?

2        A    Based on assumptions one through four.

3        Q    Correct.   Okay.   So, when I look at that number,

4    the 799.4, is any of that time block time?

5        A    No.

6        Q    Okay.   And that would be the same for all of the

7    other values in the "In California" column for all three

8    of the plaintiffs, correct?

9        A    Yes.

10       Q    But block time is included in the "All" time

11   column, correct?

12       A    Yes.

13       Q    Okay.   And so, for each of the values that are

14   stated here, each of the named plaintiffs had time that

15   they worked in California, correct, under your

16   definition of "In California," correct?

17       A    Yes.

18       Q    And so, then, in table two, we have the same --

19   well, we have another "All" column, and the table is

20   broken down from days in California to weeks in

21   California.   So, the number -- just taking, for example,

22   the number for Lisa Marie Smith, which is 478.   That

23   number represents what?

24       A    It's the number of days with the least -- not

25   zero hours in California, given the definition of

1   plaintiffs, correct?

2       A    No.

3       Q    And then on table three, which is on page 10,

4   again, the definition that you are using for "In

5   California" that applies to this table does not include

6   time -- block time, even if that time was at a

7   California airport; is that correct?

8       A    Yes.

9       Q    And, going back to table two.  Do each of the

10  plaintiffs have some time, according to your

11  calculations, where they worked in excess of eight hours

12  in California?

13          MR. HENDRICKS:  Vague and ambiguous as to the

14  phrase "worked."  Misstates the report with respect to

15  the word "worked".  Lacks foundation.  You may answer.

16          THE WITNESS:  Potentially work, yes.  All have

17  potentially worked at least one day, more than eight

18  hours.

19          MS. OLIVIER:  Q.  At least two days, correct?

20      A    Yes.  More than zero, yeah.

21      Q    And so, for Ms. Bernstein that's two days, for

22  Ms. Smith that's 17 days, and Ms. Garcia that's 14 days,

23  correct?

24      A    Yes.

25      Q    And that's based on the data that you looked at

1  that comprises the time period from March 18th of 2011,

2  through February 5th of 2016, correct?

3      A   For two of the plaintiffs, I think they

4  terminate before the end of my data.  So, March 18,

5  2011, through either termination or the end of the data.

6  So, yeah.

7      Q   The end of the data that you --

8      A   Yes.  February -- February of this year, yes.

9      Q   Okay.  And then, going back to table three.  For

10 each of the name -- for each of the plaintiffs,

11 Ms. Smith, Ms. Bernstein and Ms. Garcia, you indicated

12 that there were at least, in Ms. Bernstein's case, four

13 days, and Ms. Smith's case, 31 days, and Ms. Garcia's

14 case, 23 days, where they were potentially eligible for

15 a meal period based on the number of hours you recorded

16 as "In California" on those days, correct?

17         MR. HENDRICKS:  Vague and ambiguous in terms of

18 as "in California," but you may answer.

19         THE WITNESS:  Well, recorded or considered as

20 California, but, yeah.

21         MS. OLIVIER:  Q.  And, again, you're defining

22 California -- "In California" to exclude all block time,

23 even if that block time took place at a California

24 airport, correct?

25     A   Yes.

1    Q   Or, "In California" anywhere, correct?  In other

2   words, if a plane is not -- no longer at an airport, but

3   in the air, you're not including any of that time,

4   correct?

5    A   Yes.

6    Q   And so, for under that definition of "In

7   California," under table three, Ms. Smith, Ms. Bernstein

8   and Ms. Garcia all had days where they were potentially

9   eligible for a meal -- for a rest break, correct?

10    A   Yes.  They were potentially eligible, yeah.

11    Q   And so, in the last -- the last sentence on this

12   page below table three, you state that, "In addition,

13   all six days where plaintiffs were not assigned to

14   non-flight activities and were potentially eligible for

15   a rest break due to work in California, show enough time

16   in between flights for the plaintiffs to have taken a

17   rest break."

18         What constitutes "enough" under your -- your

19   understanding there?

20    A   If you look on my production, I listed those six

21   days.  So, you will see that there was enough time

22   between an arrival and a departure for disembarking,

23   reporting to the next flight, and there will still be

24   time left in between flights for the plaintiff to have

25   taken a break.

**Valentin Estevez, Ph.D.**                    **Bernstein, et al. vs. Virgin America, Inc.**

1      I, ALESIA L. COLLINS, a Certified Shorthand

2   Reporter of the State of California, do hereby certify:

3      That the foregoing proceedings were taken

4   before me at the time and place herein set forth; that

5   any witnesses in the foregoing proceedings, prior to

6   testifying, were duly sworn; that a record of the

7   proceedings was made by me using machine shorthand,

8   which was thereafter transcribed under my direction;

9   that the foregoing transcript is a true record of the

10   testimony given.

11      Further, that if the foregoing pertains to the

12   original transcript of a deposition in a federal case,

13   before completion of the proceedings, review of the

14   transcript [X] was [ ] was not requested.

15

16      I further certify that I am neither financially

17   interested in the action nor a relative or employee of

18   any attorney or party to this action.

19      IN WITNESS WHEREOF, I have this date

20   subscribed my name.

21   DATED: September 21, 2016

22

23

24   _____

25   ALESIA L. COLLINS
    CLR, CSR No. 7751