UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JULIA BERNSTEIN, et al.,

    Plaintiffs,

  v.

VIRGIN AMERICA, INC.,

    Defendant.

Case No.15-cv-02277-JST

**ORDER CERTIFYING CLASS AND DENYING MOTION TO STRIKE**

Re: ECF Nos. 70, 74

  Before the Court is Plaintiffs' motion for class certification and Defendant's motion to strike the expert report of David Breshears. ECF Nos. 70, 74. The Court grants the motion for class certification and denies the motion to strike.

## I. BACKGROUND

### A. Factual History

  The Plaintiffs are flight attendants who currently work or have previously worked for Defendant Virgin America, Inc. ("Virgin"). In this putative class action against Virgin, the Plaintiffs allege that Virgin did not pay them for hours worked before, after, and between flights; time spent in training; time on reserve; time spent taking mandatory drug tests; and time spent completing incident reports. See First Amended Class Action Complaint, ECF No. 32 ¶¶ 28-41. The Plaintiffs further allege that Virgin did not allow flight attendants to take meal or rest breaks, failed to pay overtime and minimum wages, and failed to provide accurate wage statements. Id.

#### 1. The Parties

  Virgin is an airline company that is headquartered in Burlingame, California. Depo. of Valerie Jenkins, ECF No. 44-1 at 71:4.[1] Plaintiffs Julia Bernstein, Esther Garcia, and Lisa Marie

---

[1] The Court refers to the pagination created by the Court's electronic filing system, not the document's internal pagination, throughout this Order.

Smith all previously worked for or currently work for Virgin as flight attendants. ECF No. 50-17, Ex. 23; ECF No. 50-17, Ex. 24; ECF No. 50-17, Ex. 25. During the course of their employment with Virgin, each of the Plaintiffs were based out of either San Francisco International Airport or Los Angeles International Airport. Id.

### 2. Flight Attendant Scheduling Terminology and Responsibilities

Virgin schedules its flight attendants to fly "pairings," a series of flights over a series of continuous days that depart and return to the airport out of which flight attendants are based. ECF No. 44-1, Ex. 1 at 4:10-16; ECF No. 44-1, Ex. 2 at 59:6-13. Each pairing consists of one or more "duty periods." ECF No. 44-1, Ex. 1 at 5:18-25. Virgin's Work Rules require that each flight attendant report for duty one hour before the departure of her first scheduled flight of the day. ECF No. 45-2, Ex. 8 at 31. After they check in for duty, flight attendants must travel to the departure gate of their first flight and be onboard the flight no less than forty-five minutes before the scheduled departure. ECF No. 46-2 at 18. They must also attend two pre-flight briefings, greet and assist passengers in boarding, and generally prepare the cabin for departure. ECF No. 47-2 at 131-134; ECF No. 47-2 at 143-146. "Block time" is the amount of time within a duty period from when an aircraft pushes back from the gate ("block out") at its departure city to when the aircraft arrives at the gate ("block in") at its destination. ECF No. 50-2 at 6:11-21, 8:13-21. Once the flight arrives at its destination, flight attendants help passengers deplane and check the cabin for items left onboard. ECF No. 47-2 at 177. Flight attendants are not released from duty until fifteen minutes after their last scheduled flight of the day. ECF No. 45-3 at 2.

When a flight attendant works a subsequent flight in a duty period, the time between the block in of the first flight and block out of the second flight is referred to as "turn time." As with the first flight of the day, flight attendants must report for duty at the second flight's departure gate and be onboard that flight forty-five minutes before the scheduled departure. ECF No. 47-2 at 129. Flight attendants remain on duty during turn time. ECF No. 44-1 at 93:13-20.

### 3. Virgin's Policies Regarding Compensation and Breaks

Virgin's InFlight Work Rules outline its detailed compensation policies for flight attendants. ECF Nos. 45-46, Exhibits 8, 9, 10. And Virgin's Crew Pay Manual is used by

Virgin's payroll department to process flight attendant compensation. ECF No. 47-3, Ex. 12.

Pursuant to those policies, for the most part Virgin does not compensate flight attendants for all of their hours spent on duty, but rather only for block time. ECF No. 47-3 at 8 ("Even for flying activity, crewmembers are not paid for time 'on the clock' (duty time); instead, they are typically paid only when the aircraft is moving (block time)."). This means that Virgin does not pay flight attendants for work performed outside of block time, such as time spent participating in pre-flight briefings, boarding passengers, and deplaning. Virgin also does not pay flight attendants for time spent completing incident reports outside of block time. ECF No. 50-17 ¶ 16. Nor does Virgin compensate flight attendants for turn time in between flights. ECF No. 45-4 at 12-13.

Virgin does, however, pay flat rates for some non-block time activities. For example, it pays flight attendants thirty minutes of pay for drug testing, regardless of the duration of the drug test. ECF No. 47-5 at 7. Virgin also pays a flat monthly rate for initial flight attendant training, irrespective of the actual hours worked by flight attendants during this training. ECF No. 45-4 at 24. Virgin pays flight attendants 3.5 hours of pay for annual training even though those trainings last at least eight hours. ECF No. 45-4 at 16; see also, e.g., ECF No. 50-17 ¶ 22. Virgin pays flight attendants four hours of pay for airport reserve shifts in which they are not assigned to a flight, even though those shifts can last up to six hours. ECF No. 47-5 at 9. If a flight attendant is assigned a flight during their reserve shift, they are paid for half of the total time spent on reserve plus that flight's block time. Id.

Per Virgin's policies, crew leaders provide rest and meal periods for flight attendants. ECF No. 50-13 at 22. However, Virgin admits that, although its flight attendants have the opportunity to take breaks, they are still on duty throughout the entirety of a flight. ECF No. 71 at 15; ECF No. 44-1 at 96:1-6. Many flight attendants claim that they are unable to take breaks on flights. See, e.g., ECF No. 50-17, Ex. 23, ¶ 18.

Virgin's wage statements do not indicate the duty period hours worked or the block hours worked. ECF No. 50-2, Ex. 1 at 34:19-21, 36:17-24.

**B.  Procedural History**

The Plaintiffs commenced this action in state court, and Virgin removed it to federal court pursuant to the diversity jurisdiction provision of the Class Action Fairness Act.  ECF No. 1.

On July 6, 2016, the Plaintiffs filed this motion for class certification.  ECF No. 50.[2]  They seek to certify the following class and subclasses under Rule 23(b)(3):

> **Class**: All individuals who have worked as California-based flight attendants of Virgin America, Inc. at any time during the period from March 18, 2011 (four years from the filing of the original Complaint) through the date established by the Court for notice of certification of the Class (the "Class Period").

> **California Resident Subclass**: All individuals who have worked as California-based flight attendants of Virgin America, Inc. while residing in California at any time during the Class Period.

> **Waiting Time Penalties Subclass**: All individuals who have worked as California-based flight attendants of Virgin America, Inc. and have separated from their employment at any time since March 18, 2012.

ECF No. 70 at 2.  Plaintiffs seek to certify their claims for Virgin's failure to pay for all hours worked, failure to pay minimum wage, failure to pay overtime, failure to provide rest and meal periods, failure to provide accurate wage statements, and derivative claims for waiting time penalties and violations of California Unfair Competition Law.[3]  Id. at 22.  With respect to the proposed Class, the Plaintiffs limit their claims to time worked within California.  ECF No. 70 at 10.  However, with respect to the proposed California Resident Subclass, the Plaintiffs seek to recover wages for time spent working both within and outside California.  Id.  Plaintiffs' counsel represents without contradiction that all members of the proposed California Resident Subclass are also members of the proposed Class.

## II.  JURISDICTION

Pursuant to the Class Action Fairness Act (CAFA), the Court has jurisdiction over this

---

[2] The Plaintiffs have since filed a new version of the motion that complies with the Court's formatting requirements.  See ECF Nos. 55, 56, 70.

[3] The Plaintiffs' unfair competition claims are derivative of the Plaintiffs' wage claims because "failure to pay legally required overtime compensation falls within the UCL's definition of an 'unlawful . . . business act or practice.'"  Sullivan, 51 Cal. 4th at 1206 (citing Cortez v. Purolator Air Filtration Products Co., 23 Cal.4th 163, 177 (2000)).

case, as a class action in which a member of the class of plaintiffs is a citizen of a state different from any defendant, there are more than 100 class members nationwide, and the matter in controversy exceeds the sum of $5 million, exclusive of interests and costs.  28 U.S.C. § 1332(d).

## III.    LEGAL STANDARDS

### A.    Motion to Strike

Federal Rule of Evidence 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
>> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>>
>> (b) the testimony is based on sufficient facts or data;
>>
>> (c) the testimony is the product of reliable principles and methods; and
>>
>> (d) the expert has reliably applied the principles and methods to the facts of the case.

In the Ninth Circuit, Rule 702 "contemplates a *broad conception* of expert qualifications." Hangarter v. Provident Life & Accident Ins. Co., 373 F.3d 998, 1015 (9th Cir. 2004) (emphasis in original) (quoting Thomas v. Newton Int'l Enters., 42 F.3d 1266, 1269 (9th Cir. 1994)). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 596 (1993); see also Primiano v. Cook, 598 F.3d 558, 564 (9th Cir. 2010) ("Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion.").  To testify as an expert, an individual "need not be officially credentialed in the specific matter under dispute." Massok v. Keller Indus., Inc., 147 Fed.Appx. 651, 656 (9th Cir. 2005) (citing United States v. Garcia, 7 F.3d 884, 889-90 (9th Cir. 1993)).

On the other hand, "[u]nder <u>Daubert</u>, the trial court must act as a 'gatekeeper' to exclude junk science that does not meet Federal Rule of Evidence 702's reliability standards." <u>Ellis v. Costco Wholesale Corp.</u>, 657 F.3d 970, 982 (9th Cir. 2011) (citing <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137, 145, 147-49 (1999)).  To satisfy <u>Daubert</u>, scientific evidence must be both reliable and relevant.  509 U.S. at 590-91, 597.  The proponent of the expert's testimony bears the burden of proving admissibility.  <u>Lust By & Through Lust v. Merrell Dow Pharm., Inc.</u>, 89 F.3d 594, 598 (9th Cir. 1996).

The law pertaining to <u>Daubert</u>'s reliability prong has been summarized as follows:

> Reliable testimony must be grounded in the methods and procedures of science and signify something beyond "subjective belief or unsupported speculation." <u>Daubert</u>, 509 U.S. at 590.  The inferences or assertions drawn by the expert must be derived by the scientific method.  <u>Id.</u>  In essence, the court must determine whether the expert's work product amounts to "'good science.'" <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 43 F.3d 1311, 1315 (9th Cir. 1995) ("<u>Daubert II</u>") (quoting <u>Daubert</u>, 509 U.S. at 593).  In <u>Daubert</u>, the Supreme Court outlined factors relevant to the reliability prong, including: (1) whether the theory can be and has been tested; (2) whether it has been subjected to peer review; (3) the known or potential rate of error; and (4) whether the theory or methodology employed is generally accepted in the relevant scientific community." <u>Daubert</u>, 509 U.S. at 593-94.  The Supreme Court emphasized the "flexible" nature of this inquiry. <u>Id.</u> at 594.  As later confirmed in <u>Kumho Tire</u>, "<u>Daubert</u>'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case.  Rather the law grants a district court the same broad latitude when it decides how to determine reliability as [the court] enjoys in respect to its ultimate reliability determination." 526 U.S. at 141-42.

<u>Abarca v. Franklin Cnty. Water Dist.</u>, 761 F. Supp. 2d 1007, 1021 (E.D. Cal. 2011).  "The relevance prong under <u>Daubert</u> means that the evidence will assist the trier of fact to understand or determine a fact in issue." <u>Henricksen v. ConocoPhillips Co.</u>, 605 F. Supp. 2d 1142, 1154 (E.D. Wash. 2009) (citing <u>Daubert</u>, 509 U.S. at 591-92).

**B.      Class Certification**

Class certification under Rule 23 is a two-step process.  First, a plaintiff must demonstrate

that the numerosity, commonality, typicality, and adequacy requirements of 23(a) are met.

> One or more members of a class may sue or be sued as representative parties on behalf of all members only if (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). "Class certification is proper only if the trial court has concluded, after a 'rigorous analysis,' that Rule 23(a) has been satisfied." Wang v. Chinese Daily News, Inc., 709 F.3d 829, 833 (9th Cir. 2013) (quoting Wal-Mart Stores, Inc. v. Dukes, 546 U.S. 338, 351 (2011)).

Second, a plaintiff must also establish that one of the bases for certification in Rule 23(b) is met. Here, the Plaintiffs invoke Rule 23(b)(3), which requires the Court to find "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

The party seeking class certification bears the burden of demonstrating by a preponderance of the evidence that all four requirements of Rule 23(a) and at least one of the three requirements under Rule 23(b) are met. See Dukes, 546 U.S. at 350-51.

## IV. DISCUSSION

### A. Motion to Strike

The Plaintiffs filed a report prepared by their expert, David Breshears, in support of their motion for class certification. ECF No. 50-18, Ex. 26. Breshears' report proposes a method for calculating damages for the named Plaintiffs that he claims could similarly be applied on a class-wide basis. Id. ¶ 1. Virgin moved separately to strike the Plaintiffs' expert report as irrelevant and unreliable. ECF No. 74.[4]

To perform his analysis, Breshears relies primarily on three months of flight schedule

---

[4] The Court considers the motion to strike even though evidentiary objections to a motion must be contained "within the brief or memorandum" submitted in opposition, see Civ. L.R. 7-3(a), because Virgin raised many of the same objections within its opposition brief. ECF No. 71 at 10, 31-32.

activity and earnings statements for each of the three named Plaintiffs. ECF No. 50-18, Ex. 26 ¶¶ 5-6, 10. Using the flight schedule data, Breshears first calculates the amount of time each flight attendant spent on duty. Id. This calculation is relatively simple given that Virgin has a uniform policy that requires its flight attendants to report for duty one hour before the scheduled departure and to remain on duty until fifteen minutes after their last flight lands. To calculate unpaid wages, Breshears first determines the number of uncompensated hours by subtracting the number of hours for which the flight attendant was actually compensated (as indicated in their earnings statements) from the number of hours spent on duty. Id. ¶¶ 11-13. Breshears then multiplies the number of uncompensated hours by the flight attendant's base hourly rate to arrive at a damages calculation. Id. Breshears uses a similar methodology to calculate damages for unpaid overtime. Id. ¶ 14. To calculate damages arising from missed meal breaks, Breshears assumes that each flight attendant should have received a duty-free meal break for every five-hour duty period. Id. ¶ 15.

First, Virgin argues that Breshears' opinion is not relevant at the class certification stage because it does not pertain to liability, but rather to the calculation of damages. ECF No. 74 at 6. This argument fails. To succeed on their motion for class certification, the Plaintiffs must also show "that damages could feasibly and efficiently be calculated once the common liability questions are adjudicated." Leyva v. Medline Indus. Inc., 716 F.3d 510, 514 (9th Cir. 2013). Breshears' report, which proposes a methodology for calculating damages on a class-wide basis, is clearly relevant. ECF No. 50-18, Ex. 26, ¶ 1.

Next, Virgin argues that Breshears' report is unreliable because he assumed that all time reflected in the data was compensable under California law without proposing a methodology for determining whether class members principally worked in California. ECF No. 74 at 7. However, Breshears' report explains how he could limit his analysis to hours spent working in California if necessary. ECF No. 50-18, Ex. 26 at 6, n. 18. If the Court ultimately determines that the flight attendants can only recover for hours worked in California, Breshears' methodology can adequately account for that variable. See Ralston v. Mortgage Inv'rs Grp., Inc., No. 08-536-JF PSG, 2011 WL 6002640, at *97-98 (N.D. Cal. Nov. 30, 2011) ("Regardless of what the district court ultimately determines to be the appropriate theory of recovery for calculation of damages at

trial, for the purposes of this motion, the court accepts Lyons' testimony that the model can account for out-of-pocket or restitution damages as well or instead of benefit-of-the-bargain damages. . . . [the defendant's] argument that the report should be excluded where relevant factors are unaddressed is unpersuasive where the court has yet to determine which factors are relevant to the class claims.").   In any event, this failure to consider a potentially relevant factor in his analysis goes to the weight of the evidence, not its admissibility.  See Edwards v. Nat'l Milk Producers Fed'n, No. C 11-04766 JSW, 2014 WL 4643639, at *6 (N.D. Cal. Sept. 16, 2014) (explaining that "while the omission of variables from analysis 'may render the analysis less probative than it otherwise might be, it can hardly be said, absent some other infirmity, that an analysis which accounts for the major factors must be considered unacceptable as evidence") (quoting Bazemore v. Friday, 478 U.S. 385, 400 (1986) (internal quotation marks and citations omitted)).  The Court therefore refuses to strike the report on that ground.

Virgin also challenges the fact that Breshears manually entered data into spreadsheets to conduct his analysis.  This objection does not go to the reliability of Breshears' methodology itself, but rather to his application of that methodology to the small data set used at the class certification stage, which encompassed just three months of data for three people.  However, Breshears does not need to provide a complete model for damages at the class certification stage; he may rely on a sample of data to demonstrate that he has a reliable method for determining damages on a class-wide basis.  See In re ConAgra Foods, Inc., 90 F. Supp. 3d 919, 945-47 (C.D. Cal. 2015) (holding that the expert's "preliminary" damages model was reliable at the class certification stage where the expert "identified the information he is attempting to obtain that will permit him to conduct [the full class-wide] analysis" and stated that the full analysis would be conducted "in the same manner" as the preliminary analysis).  Here, Breshears' report identifies the additional data sources he would need to conduct a full analysis—namely, class members' payroll records—and explains how this analysis could performed over a larger data set by importing Virgin's data into a spreadsheet and using algorithms.  See ECF No. 50-18, Ex. 26, ¶ 23; ECF No. 84-1 ¶ 5; Depo. of David Breshears, ECF No. 79-4, Ex. 3 at 6:22-8:11.

Next, Virgin argues that Breshears' methodology for calculating damages related to missed

9

meal breaks does not identify when flight attendants *actually* took a meal break. ECF No. 74 at 11. However, whether individual flight attendants actually took meal breaks is irrelevant given the Plaintiffs' theory of liability. The Plaintiffs argue that—regardless of whether and when the flight attendants took breaks—those breaks were necessarily taken while the flight attendants were still on duty and, therefore, the breaks did not comply with California law. See Brinker Rest. Corp. v. Superior Court, 53 Cal. 4th 1004, 1035 (2012) ("[A]n employer's obligation is to provide an off duty meal period: an uninterrupted 30–minute period during which the employee is relieved of all duty. The IWC's wage orders have long made a meal period's duty-free nature its defining characteristic."). Breshears' methodology for identifying missed meal periods therefore fits with the Plaintiffs' legal claims and the facts of this case. See Villalpando v. Exel Direct Inc., No. 12-CV-04137-JCS, 2016 WL 1598663, at *20 (N.D. Cal. Apr. 21, 2016) ("Given that Plaintiffs are entitled to prove their time worked based on reasonable inference, the Court finds that the assumptions Breshears has used to fill in the gaps are supported by sufficient evidence to render them non-speculative and potentially helpful to the jury, which is all that *Daubert* requires.").

Having reviewed the remainder of the alleged inaccuracies present in Breshear's report, the Court concludes that these objections go to the weight of the evidence, not its admissibility. The Court finds that Breshears' testimony satisfies the requirements of Daubert, and accordingly denies Virgin' motion to strike.

### B. Class Certification

#### 1. Ascertainability

As a threshold matter, Virgin argues that California's wage and hour laws only apply to individuals who "exclusively" or "principally" work in California, regardless of whether they are California residents or based out of California airports. Therefore, Virgin argues, the Court can only identify class members who have a right to recover by making individualized inquiries into whether each flight attendant principally worked in California such that they were even protected by California law. ECF No. 71 at 17-22.

As a preliminary matter, it is important to note that this potential extraterritoriality issue is only relevant with respect to the Plaintiffs' proposed California Resident Subclass, which the

Plaintiffs admit "seeks . . .. to recover for wages earned both inside and outside of California." ECF No. 84 at 12. The proposed Class, in contrast, "limits their claims to time worked within California," and it is clear that California's wage and hour laws apply to such claims. ECF No. 70 at 10.

As explained below, it is unsettled whether California's wage and hour laws apply to work that members of the proposed California Resident Subclass performed outside of California for a California employer when they temporarily left the state in the course of their normal work duties. Today the Court only needs to resolve that question to the extent the answer might require unmanageable individualized inquiries to identify members of the California Resident Subclass. Amgen Inc. v. Connecticut Ret. Plans & Trust Funds, 133 S. Ct. 1184, 1194–95 (2013) ("Merits questions may be considered to the extent – but only to the extent – that they are relevant to determining whether Rule 23 prerequisites for class certification are satisfied."). The Court concludes that it need not decide this issue now because it is clear that members of the proposed Class can recover unpaid wages for time worked *within* California, and every member of the proposed California Resident Subclass is also a member of the proposed Class.[5] Therefore, there is no ascertainability issue and no reason why class certification cannot be decided now. To the extent the upcoming motion for summary judgment reveals useful information about the proper basis of recovery for members of the California Resident Subclass—i.e. California residency, receipt of pay in California, primary job situs in California, or a mix of all three—the Court can feasibly identify those Subclass members who have a right to recover by looking to Virgin's business records.

### a. Applicability of California Law

California law presumptively does not apply to conduct that takes place outside of California unless a contrary intent "is clearly expressed or reasonably to be inferred from the language of the act or from its purpose, subject-matter, or history." N. Alaska Salmon Co. v. Pillsbury, 174 Cal. 1, 4 (1916) (internal quotation marks omitted) ("Ordinarily, the statutes of a

---

[5] Plaintiffs' counsel represented this to the Court, without contradiction, at the hearing on this matter on October 18, 2016.

state have no force beyond its boundaries."). Courts therefore look to both the language and the legislative history to determine whether the legislature intended for a statute to operate extraterritorially. See Sullivan v. Oracle Corp., 51 Cal. 4th 1191, 1207 (2011); see also, e.g., Tidewater Marine W., Inc. v. Bradshaw, 14 Cal. 4th 557, 577 (1996) (citing California's workers' compensation law, which applies to workers hired in California but injured out of state, as an example of a statute that "explicitly governs employment outside the state's territorial boundaries"). Virgin places great weight on this presumption in arguing that certification is not appropriate.

There is, however, a potentially competing presumption: "If an employee resides in California, receives pay in California, and works exclusively, or principally, in California, then that employee is a 'wage earner of California' and presumptively enjoys the protection of [Industrial Welfare Commission] regulations." Tidewater, 14 Cal. 4th at 578 (quoting Cal. Lab. Code § 50.5). The California Supreme Court applied this presumption in Tidewater, in which it held that employees who worked on boats in the Santa Barbara Channel were California wage earners that presumptively enjoyed the protections of Industrial Welfare Commission ("IWC") wage orders because they "reside in California, receive pay in California, and work in California." Id. at 578-79. Although the court explained that "California's territorial boundaries are relevant to determining whether IWC wage orders apply," it nonetheless refused to adopt a bright-line rule that "IWC wage orders apply to *all* employment in California, and *never* to employment outside California." Id. at 577-78. For example, the court left room for the possibility that "[t]he Legislature may have similarly intended extraterritorial enforcement of IWC wage orders in limited circumstances, such as when California residents working for a California employer travel temporarily outside the state during the course of the normal workday but return to California at the end of the day." Id.

The California Supreme Court further clarified the California wage-earner presumption in Sullivan v. Oracle Corp., 51 Cal. 4th 1191 (2011). In that case, the court held that the California Labor Code applied to overtime work performed in California for a California-based employer by nonresidents who "worked mainly in their home states but also in California and several other

12

states." Id. at 1195, 1206. In reaching this conclusion, the court rejected the defendant's misreading of Tidewater to the effect that "California overtime law follows California residents wherever they go throughout the United States . . . other states' overtime laws must be allowed to follow their own residents into California to avoid an offense to interstate comity" – meaning that California overtime laws could never apply to non-residents. Id. at 1198. Instead, the Sullivan court explained, Tidewater simply "caution[ed] against overly broad conclusions about the extraterritorial application of employment laws" and "foresaw . . . only limited extraterritorial application of California's employment laws." Id. at 1199. For example, the court reiterated its statement in Tidewater that "California law . . . might follow California resident employees of California employers who leave the state 'temporarily . . . during the course of the normal workday.'" Id. (quoting Tidewater, 14 Cal.4th at 578). Because the plaintiffs in Sullivan sought overtime compensation "only for entire days and weeks worked in California," the court held that "[n]othing in Tidewater suggests a nonresident employee, especially a nonresident employee of a California employer such as Oracle, can enter the state for entire days or weeks without protection of California law." Id. at 1195, 1199 (emphasis omitted). The court further explained that this result was consistent with "the state's important public policy goals of protecting health and safety and preventing the evils associated with overwork." Id. at 1191.

Neither Tidewater nor Sullivan directly applies to the situation here, where California residents who work for a California company leave the state temporarily in their regular course of employment. Because the Tidewater court found that the Santa Barbara Channel was located within California's territorial boundaries, it "express[ed] no opinion as to whether the trial court can enjoin the application of IWC wage orders to crew members who work primarily outside California's state law boundaries." Tidewater, 14 Cal. 4th at 578-79. And, unlike the Plaintiffs' proposed subclass, which seeks to recover for wages earned both inside and outside of California, the plaintiffs in Sullivan claimed overtime compensation only for extended periods of time – "*entire days and weeks*" – worked "entirely in California." Sullivan, 51 Cal. 4th at 1199-2000, 1195 (emphasis in original). Very few courts have dealt with the precise facts now before the Court, where the plaintiffs' claims fall somewhere between the presumption against extraterritorial

13

application of California's wage and hour laws and the California-wage-earner presumption.[6]

Even though the court in <u>Tidewater</u> explicitly declined to decide the precise issue that is presented here, Virgin relies on that case to argue that flight attendants can enjoy the protections of the California Labor Code *only* if they work exclusively or principally in California. ECF No. 71 at 19. In other words, Virgin asks this Court to adopt a bright-line rule that considers the percentage of time an employee spends working in California – or "job situs" – as the dispositive factor to consider when determining whether an employee is protected by California labor laws. To support its argument, Virgin relies primarily on three cases in which federal district courts held that California wage and hour laws only apply to individuals who exclusively or principally work in California: <u>Sarviss v. Gen. Dynamics Info. Tech., Inc.</u>, 663 F. Supp. 2d 883 (C.D. Cal. 2009); <u>Wright v. Adventures Rolling Cross Country, Inc.</u>, No. C-12-0982-EMC (N.D. Cal., May 3, 2012); and <u>Ward v. United Airlines, Inc.</u>, No. C 15-02309 WHA, 2016 WL 3906077, at *5 (N.D. Cal. July 19, 2016). These cases are not persuasive for several reasons.

First, the procedural posture of the <u>Ward</u> decision distinguishes it from this case and actually lends support to the Plaintiffs' argument in favor of class certification. In that case, the court certified a class of 2,660 airline pilots, despite the defendant's argument that the applicability of the California Labor Code could "only be determined on a pilot-by-pilot basis." <u>Ward</u>, No. C-15-2309, ECF No. 44 at *3. After a brief survey of the law, the court noted that "[n]o decision has directly addressed whether [the Labor Code provision at issue] applies to wage statements issued

---

[6] Perhaps the most factually similar case addressed whether United Airlines had to provide its flight attendants – many of whom were domiciled in California and based out of California airports, but who spent "little of their working time within California" – with free uniforms to comply with a California IWC order. <u>United Air Lines, Inc. v. Indus. Welfare Comm'n</u>, 211 Cal. App. 2d 729, 735 (Ct. App. 1963) <u>disapproved of on other grounds by</u> <u>Indus. Welfare Com. v. Superior Court</u>, 27 Cal. 3d 690 (1980). As explained by the California Supreme Court in <u>Tidewater</u>, the <u>United Airlines</u> court "assume[d] that IWC regulations apply to persons who are domiciled in California but work principally outside the state." <u>Tidewater</u>, 14 Cal. 4th at 578. However, the court did not engage in a thorough analysis regarding the extraterritorial application of California employment law to those who work primarily outside of California because it ultimately held that the regulation imposed an unconstitutional burden on interstate commerce. <u>Id.</u> at 748-49. Moreover, this case has little precedential value because it occurred before the California Supreme Court's decisions in both <u>Tidewater</u> and <u>Sullivan</u>.

to California residents that performed a majority of their work outside the state." Id. at *8. The court therefore concluded that this was "an unsettled legal question clearly capable of class-wide resolution." Id. However, the court noted that, should "[the defendant] ultimately persuade the Court that California's wage-statement laws should only apply when a pilot principally worked in California," therefore resulting in "unmanageable" individualized inquiries, the Court would consider decertifying the class. Id. But the possibility of unmanageable individualized inquiries down the road was "insufficient to defeat class certification in the first instance." Id.

The Ward court eventually granted summary judgment to the defendant, holding that California's labor law regarding accurate wage statements did not apply to airline pilots who worked primarily outside of California, see Ward, 2016 WL 3906077, at *5 (N.D. Cal. July 19, 2016). In reaching this conclusion, the court stated that "[t]he few decisions that have evaluated whether California's wage and hour laws . . . apply to out-of-state work performed by California residents uniformly rejected that proposition." Id. at *3. To support this assertion, the court cited to several inapposite cases. For example, the court cited to a case that addressed the extraterritorial application of a different statute altogether—California's Fair Employment and Housing Act (FEHA). See Anderson v. CRST Int'l, Inc., 2015 WL 1487074 (C.D. Cal. Apr. 1, 2015). In addition, the court cited to a case that was not directly applicable because it dealt with the extraterritorial application of California law to work performed outside of California by *non-residents*. Priyanto v. M/S AMSTERDAM, No. CV 07-3811AHMJTLX, 2009 WL 175739, at *7–8 (C.D. Cal. Jan. 23, 2009). The court also relied on a case that did not address extraterritoriality, but rather held that the plaintiff's state law claims were barred because he worked on a federal military enclave. Taylor v. Lockheed Martin Corp., 78 Cal. App. 4th 472, 478 (2000). Finally, the court relied on Tidewater, which did not directly address whether California employment law applied to California residents who work primarily outside of California's state law boundaries, but left room for the possibility that it might apply "in limited circumstances." Tidewater, 14 Cal. 4th at 578-79. In sum, the court in Ward did not provide any relevant support for its conclusion that California wage and hour laws only apply to work performed in California.

The <u>Sarviss</u> court similarly adopted a bright-line job situs rule without adequate support. The plaintiff in <u>Sarviss</u> "[did] not clearly fall into this 'wage earner of California' presumption" because he only satisfied two of the three <u>Tidewater</u> elements: he was "a California resident who presumably received his pay in California," but "he performed the significant majority of his employment *outside* of California." <u>Sarviss</u>, 663 F. Supp. 2d at 899 (emphasis in original). The court noted that "the law is unclear" on what to do in a case like this, which "appears to fall between the two *Tidewater* presumptions – the presumption against application to events occurring outside of California, on the one hand, and the presumption that wage earners of California do fall under the purview of the IWC wage orders." <u>Id</u>. The <u>Sarviss</u> court ultimately held that "the determinative issue is whether an employee principally works in California." <u>Id</u>. at 900. To support this conclusion, however, the court relied on just two cases, neither of which was directly applicable because they dealt with the extraterritorial application of California law to work performed outside of California *by non-residents*. <u>See</u> <u>Priyanto</u>, 2009 WL 175739, at *7–8; <u>Tidenberg v. Bidz.com, Inc.</u>, No. CV085553PSGFMOX, 2009 WL 605249, at *4 (C.D. Cal. Mar. 4, 2009).

The Court rejects Virgin's singular emphasis on job situs because it ignores several key aspects of California Supreme Court precedent on the issue. First, it ignores the California Supreme Court's explicit refusal to adopt a bright-line rule based solely on whether the employee's work took place within California's territorial boundaries. <u>See</u> <u>Tidewater</u>, 14 Cal. 4th at 577-78 ("[W]e are not prepared, without more thorough briefing of the issues, to hold that IWC wage orders apply to *all* employment in California, and *never* to employment outside California.") (emphasis in original). In lieu of a bright-line rule, the California Supreme Court has endorsed an approach that potentially allows for the extraterritorial application of California wage and hour laws in "limited circumstances." <u>Tidewater</u>, 14 Cal. 4th at 578; <u>see</u> <u>Sullivan</u>, 51 Cal. 4th 1199. Perhaps most tellingly, the California Supreme Court has repeatedly left open the possibility that California employment laws might apply in a situation like this where California residents working for California employers temporarily leave the state during the course of a normal workday. <u>See</u> <u>Sullivan</u>, 51 Cal. 4th at 1199; <u>Tidewater</u>, 14 Cal. 4th at 578. For all of these

1  reasons, the Court rejects a categorical rule that determines the extraterritorial applicability of

2  California wage and hour laws based exclusively on job situs.

3      Wright and Sarviss are also factually distinguishable because the plaintiffs in those cases

4  did not temporarily travel outside of and back into California during the course of their normal

5  work duties, but rather worked continuously outside of California for an extended period of time.

6  The plaintiff in Sarviss was a helicopter pilot who was deployed to Pakistan, where he spent 90

7  continuous days out of his total four-month period of employment.  Sarviss, 663 F. Supp. 2d at

8  888.  The court in Sarviss contrasted the pilot's relocation abroad with the situation described by

9  the California Supreme Court in Tidewater in which a California employee temporarily travels

10  outside of the state during the course of a normal workday.  Id. at 900, n. 17.

11      In Wright, the plaintiffs led domestic and international tours that ranged anywhere from

12  two weeks to approximately three months in duration.  Wright, No. C-12-0982-EMC, ECF No. 22

13  at *1-2.  In other words, unlike the plaintiffs in Tidewater, they did not temporarily travel outside

14  of and back into California during the course of their normal work duties – they worked

15  continuously outside of California for an extended period of time.  Because "the vast majority of

16  the work was performed outside the state, indeed outside the country, *on a continuous basis with*

17  *not even periodic presence in California* while Plaintiffs were abroad," the Wright court explained

18  that their situation was not analogous to the situation described by the California Supreme Court.

19  Wright, No. C-12-0982-EMC, ECF No. 22 at *8-9 (emphasis added).  In contrast, the Plaintiffs in

20  this case regularly travel into and out of California airports at the beginning and end of each

21  pairing.  And the California Supreme Court has repeatedly suggested that California employment

22  law might follow California residents who work for California employers in such circumstances.[7]

23  _____

24  [7] The Industrial Wage Order for the transportation industry also contemplates its extraterritorial
application to airline employees.  See Cal. Code Regs. tit. 8, § 11090.  Paragraph 3 of that Wage

25  Order, which outlines the overtime provisions for transportation industry employees, states the
following: "The provisions of this section shall not apply where any employee of an airline

26  certified by the federal or state government works over 40 hours but not more than 60 hours in a
workweek *due to a temporary modification in the employee's normal work schedule not required*

27  *by the employer but arranged at the request of the employee*, including but not limited to
situations where the employee requests a change in days off or trades days off with another

28  employee."  Id. ¶ 3(N) (emphasis added).  This language, which enumerates the limited

In sum, the law is unsettled with respect to whether California's wage and hour laws apply to work that members of the proposed California Resident Subclass performed outside of California for a California employer when they temporarily left the state in the course of their normal work duties. It is clear, however, that members of the proposed Class can recover unpaid wages for time worked *within* California. See Sullivan, 51 Cal. 4th at 1195-2000. For this reason, and because every member of the California Resident Subclass is also a member of the proposed Class, the Court therefore finds that class certification is appropriate now. If the Court later determines that members of the California Resident Subclass can only recover if their primary job situs is in California, the Court can feasibly identify those Subclass members who have a right to recover by looking to Virgin's business records.

### b. Ascertainability Analysis

Regardless of the objective characteristics necessary to identify those members of the California Resident Subclass who have a right to recover – i.e., California residency, receipt of pay in California, primary job situs in California, or a mix of all three – the Court can feasibly identify those individuals by looking to Virgin's business records and, therefore, the proposed subclass is ascertainable.

"[C]ourts have recognized that 'in order to maintain a class action, the class sought to be represented must be adequately defined and clearly ascertainable.'" Vietnam Veterans of Am. v. C.I.A., 288 F.R.D. 192, 211 (N.D. Cal. 2012) (quoting DeBremaecker v. Short, 433 F.2d 733, 734 (5th Cir. 1970)). "[A] class definition is sufficient if the description of the class is 'definite enough so that it is administratively feasible for the court to ascertain whether an individual is a member.'" Vietnam Veterans of Am., 288 F.R.D. at 211 (quoting O'Connor v. Boeing N. Am.,

circumstances under which the overtime provisions would *not* apply to airline employees, implies that the Wage Order's overtime provisions generally *do* apply to airline employees unless those limited circumstances are present. Moreover, the relevant Wage Order excludes other transportation workers—such as taxicab drivers—from the protection of its overtime provisions, which suggests that the IWC did not intend to exclude airline employees. See id. ¶ 3(M); People v. Palacios, 41 Cal. 4th 720, 732 (2007) ("Under the maxim of statutory construction, *expressio unis est exclusio alterius,* if exemptions are specified in a statute, we may not imply additional exemptions unless there is a clear legislative intent to the contrary.").

United States District Court
Northern District of California

Inc., 184 F.R.D. 311, 319 (C.D. Cal. 1998)).  "Administrative feasibility means that identifying

class members is a manageable process that does not require much, if any, individual factual

inquiry."  Newberg on Class Actions § 3:3 (5th ed.).  And a class is ascertainable if it "identifies a

group of unnamed plaintiffs by describing a set of common characteristics sufficient to allow a

member of that group to identify himself or herself as having a right to recover based on the

description."  Hanni v. Am. Airlines, Inc., No. C 08-00732 CW, 2010 WL 289297, at *9 (N.D.

Cal. Jan. 15, 2010) (internal quotation marks and citations omitted).  In contrast, "[a] class

definition is inadequate if a court must make a determination of the merits of the individual claims

to determine whether a person is a member of the class."  Id. (quoting 5 James W. Moore, Moore's

Federal Practice § 23.21[3][c] (2001)).  The purpose of the ascertainability requirement is to avoid

"satellite litigation" over who is a member of the class and to "properly enforc[e] the preclusive

effect of final judgment" by clarifying "who gets the benefit of any relief and who gets the burden

of any loss."  Xavier, 787 F. Supp. 2d at 1089.

Here, the proposed California Resident Subclass is ascertainable because the Court can

feasibly identify its members simply by looking at Virgin's business records.  See, e.g., Hofstetter

v. Chase Home Fin., LLC, No. C 10-01313 WHA, 2011 WL 1225900, at *12 (N.D. Cal. Mar. 31,

2011) (holding that a class was ascertainable because "[a]ll the parameters for membership in this

class are objective criteria, and defendants' business records should be sufficient to determine the

class membership status of any given individual").  For example, the Plaintiffs' flight records,

which show flight departure and arrival times and locations, can be used to determine the

percentage of time that each flight attendant spent in California as a proportion of their total work

time.  See Exhibits O-Q.  In fact, even Virgin's expert admits that Virgin's flight data "record[s]

flights' departure and arrival times for every flight that plaintiffs were assigned to work," and

Virgin's expert relied on this data to determine the percentage of time that each Plaintiff spent in

California.  ECF No. 73-1 at 3, 10.  The Court can also determine residency for the proposed

California Resident Subclass by looking to either the class list provided by Virgin, which lists the

address that each flight attendant provided to Virgin, or alternatively to the state where the flight

attendant paid income taxes.  ECF No. 50-23, Ex. 40.  This case is therefore distinguishable from

the cases that Virgin relies on. Cf. Backhaut v. Apple Inc., No. 14-CV-02285-LHK, 2015 WL 4776427, at *10 (N.D. Cal. Aug. 13, 2015) ("[T[he parties do not dispute that proposed class members cannot be ascertained by reference to Defendant's existing records.").

And, although the California Resident Subclass might include members who ultimately might not be able to recover because they are not protected by California wage and hour laws, this Court has repeatedly refused to deny class certification based on that reason alone. Rodman v. Safeway, Inc., No. 11-CV-03003-JST, 2014 WL 988992, at *16 (N.D. Cal. Mar. 10, 2014) ("If Defendant is arguing that, even after a plaintiff establishes all of the Rule 23 factors, a defendant can still defeat certification by pointing to the possibility that certain members of the class will not be able to recover on their claims, the Court does not adopt that view of the 'ascertainability' inquiry."); Lilly v. Jamba Juice Co., 308 F.R.D. 231, 237 (N.D. Cal. 2014) (rejecting defendant's argument "that the ascertainability analysis requires district courts to deny certification if the class includes any members who will not be able to recover").

### 2. Numerosity

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "[C]ourts generally find that the numerosity factor is satisfied if the class comprises 40 or more members." In re Facebook, Inc., PPC Advertising Litig., 282 F.R.D. 446, 452 (N.D. Cal. 2012).

The Plaintiffs' proposed class includes more than 1,400 flight attendants who either currently work for or used to work for Virgin; the California resident subclass includes more than 1,000 flight attendants who provided Virgin with a California address; and the Waiting Time Penalties Subclass includes almost 400 flight attendants who left their employment at Virgin on or after March 18, 2012. ECF No. 50-1 ¶¶ 7-8. Therefore, the proposed class and subclasses are sufficiently numerous such that joinder would be impracticable.

### 3. Commonality and Predominance

A class is certifiable only if "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "[F]or purposes of Rule 23(a)(2) [e]ven a single [common] question will do." Dukes, 564 U.S. at 359 (internal quotation marks omitted). However, the common contention

"must be of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." <u>Id</u>. at 350. "'What matters to class certification . . . is not the raising of common 'questions' – even in droves – but rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation.'" <u>Id</u>. (quoting Richard A. Nagareda, <u>Class Certification in the Age of Aggregate Proof</u>, 84 N.Y.U. L. REV. 97, 131–32 (2009)). The party seeking certification "need only show that there is a common contention capable of classwide resolution—not that there is a common contention that will be answered, on the merits, in favor of the class." <u>Alcantar v. Hobart Serv.</u>, 800 F.3d 1047, 1053 (9th Cir. 2015) (internal quotation omitted).

A plaintiff seeking certification pursuant to Rule 23(b)(3) must show not only commonality, but also predominance. <u>See</u> <u>Hanlon v. Chrysler Corp.</u>, 150 F.3d 1101, 1022 (9th Cir. 1998). Thus, in seeking to certifying a Rule 23(b)(3) class, the plaintiff must show that the common questions in the case "predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). "When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than an individual basis." <u>Hanlon</u>, 150 F.3d at 1022 (citing Alan Wright, Arthur R. Miller & Mary Kay Kane, <u>Federal Practice & Procedure</u> § 1778 (2d ed.1986)).

"Class certification is usually appropriate where liability turns on an employer's uniform policy that is uniformly implemented, since in that situation predominance is easily established." <u>Kamar v. Radio Shack Corp.</u>, 254 F.R.D. 387, 399 (C.D. Cal. 2008), <u>aff'd sub nom.</u> <u>Kamar v. RadioShack Corp.</u>, 375 F. App'x 734 (9th Cir. 2010); <u>see</u> <u>also</u>, <u>e.g.</u>, <u>Amey v. Cinemark USA Inc.</u>, No. 13-CV-05669-WHO, 2015 WL 2251504, at *6 (N.D. Cal. May 13, 2015)("[T]he predominance requirement of Rule 23(b)(3) is generally satisfied if a party can show that an employer used a standard policy that was uniformly implemented."). This makes sense because "[s]uch centralized rules, to the extent they reflect the realities of the workplace, suggest a uniformity among employees that is susceptible to common proof." <u>In re Wells Fargo Home</u>

Mortgage Overtime Pay Litig., 571 F.3d 953, 958 (9th Cir. 2009) (noting that "courts have long found that comprehensive uniform policies detailing the job duties and responsibilities of employees carry great weight for certification purposes"). For that reason, "[c]laims alleging that a uniform policy consistently applied to a group of employees is in violation of the wage and hour laws are of the sort routinely, and properly, found suitable for class treatment." Brinker Rest. Corp. v. Superior Court, 53 Cal. 4th 1004, 1033 (2012).

Common questions will dominate this Court's adjudication of the Plaintiffs' claims because liability hinges on Virgin's company-wide policies regarding its flight attendants' working conditions and pay. The Plaintiffs generally allege that Virgin adopted several standardized employment policies that violated California wage and hour laws. Virgin's InFlight Work Rules and Crew Pay Manual support the contention that Virgin has uniform policies regarding the practices that the Plaintiffs complain of in this lawsuit. See, e.g., ECF No. 47-3 at 8 (summarizing the policy regarding payment for block time and explaining that "[a]ll pay rules are outlined in the work rules for each group, and summarized in this manual"); ECF No. 45-4 at 16, 21, 24 (explaining the policies regarding payment for hours spent in training and undergoing mandatory drug and alcohol tests). Virgin admits that its "Work Rules set forth the manner in which [flight attendants] are compensated for the non-pairing activities cited by Plaintiffs, including training, drug testing, and reserve duty." ECF No. 71 at 25. Virgin further admits that these policies are uniformly applied to all of its flight attendants. See Depo. of Rich Hendrickson, ECF No. 5-2, Ex. 1 at 12:23-25, 44:23-45:25. Because these uniform policies lie at the heart of the Plaintiffs' claims, the dominant legal questions – namely, whether each of the challenged employment policies violate California law – can be resolved for all class members in a single adjudication through common proof. See McCowen v. Trimac Transp. Servs. (W.), Inc., 311 F.R.D. 579, 588 (N.D. Cal. 2015) (holding that "class-wide legal questions predominate because the legality of the [employer's policy], which applied uniformly to drivers, lies at the foundation of each of the wage claims").

Common questions will also predominate with respect to the Plaintiffs' claim that Virgin failed to provide accurate wage statements. The wage statements follow a uniform format and

Virgin's knowledge of any inaccuracies in its wage statements can be determined on a class-wide basis. See Jimenez v. Menzies Aviation Inc, No. 15-CV-02392-WHO, 2016 WL 3231106, at *8 (N.D. Cal. June 13, 2016) (finding predominance with respect to the plaintiffs' wage statement claims because "the uniform pay stubs can serve as a common form of proof of the presence or absence of the required information during the class period").

The same is true for the Plaintiffs' meal and rest break claims. Virgin's written policies require flight attendants to remain on-duty from an hour before the flight until fifteen minutes after the last flight of a pairing, including time between flights. ECF No. 47-2 at 129, 179. And Virgin admits that its flight attendants, while "encourage[d]" to take breaks, cannot be relieved of all of their duties during breaks. Depo. of Valerie Jenkins, ECF No. 83-5, Ex. 51 at 3:16-3:25. The Plaintiffs' theory of liability is that the admittedly on-duty nature of any breaks provided violates California law. Brinker Rest. Corp. v. Superior Court, 53 Cal. 4th 1004, 1035 (2012) ("[A]n employer's obligation is to provide an off duty meal period: an uninterrupted 30–minute period during which the employee is relieved of all duty. The IWC's wage orders have long made a meal period's duty-free nature its defining characteristic."). And the Plaintiffs have provided testimony consistent with that theory. See, e.g., ECF No. 50-17, Ex. 23 ¶ 19. The legality of this uniform, on-duty break policy is therefore a common question that will be answered through common proof. Brinker Rest. Corp. v. Superior Court, 53 Cal. 4th 1004, 1033–34 (2012) ( "The theory of liability – that Brinker has a uniform policy, and that that policy, measured against wage order requirements, allegedly violates the law – is by its nature a common question eminently suited for class treatment.").

Virgin presents two arguments in response. First, it argues that the Court must find that Virgin's compensation policy is "per se unlawful" before it can certify a class. ECF No. 71 at 24. This argument misunderstands the predominance requirement: "Rule 23(b)(3) requires a showing that *questions* common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." Amgen, 133 S. Ct. at 1191. As explained above, the Court has already pointed to significant evidence that Virgin has a uniform compensation policy that is uniformly applied to all of its flight attendants. The Court does not need to determine whether that

23

uniform policy violates California law at the class certification stage.

Second, Virgin argues that there are individualized questions regarding whether each flight attendant actually worked off-the-clock – and if so, how much time they spent off-the-clock – while attending training, undergoing drug testing, serving on reserve, and completing incident reports. ECF No. 71 at 26. Virgin further argues that "there is a great divergence in the record evidence before the Court regarding these alleged off-the-clock activities." Id. at 27. For example, Virgin argues, not all flight attendants complete their incident reports outside of block time and some flight attendants have never been drug-tested. Id.

Most of these individualized questions are related to the calculation of damages. The Ninth Circuit has made clear repeatedly that "the presence of individualized damages cannot, by itself, defeat class certification under Rule 23(b)(3)." Leyva v. Medline Industries Inc., 716 F.3d 510, 514 (9th Cir. 2013); see also Pulaski & Middleman, LLC v. Google, Inc., 802 F.3d 979, 986 (9th Cir. 2015) ("damage calculations alone cannot defeat certification" (quoting Yokoyama v. Midland Nat. Life Ins. Co., 594 F.3d 1087, 1094 (9th Cir. 2010)). At the class certification stage, the Plaintiffs must simply demonstrate that damages can "feasibly and efficiently be calculated once the common liability questions are adjudicated." Id.

Here, the Plaintiffs have made that showing through David Breshears' expert report. ECF No. 50-18, Ex. 26. That report demonstrates that it will be possible to calculate damages for the class claims by referencing Virgin's own records, which track when and how much time each flight attendant spent performing many of the tasks that they claim they should have been paid for, such as non-flight duty time, training, incident reports, and drug testing. See, e.g., ECF No. 50-19 at 40 (showing Plaintiff Julia Bernstein's duty reporting time and block time for the April 2012 bid period); ECF No. 83-4 (showing the time at which Plaintiff Esther Garcia submitted an incident report). To the extent Virgin's records do not keep track of work duties that are relevant to the Plaintiffs' claims – such as how much time Plaintiffs spent taking mandatory drug tests – the Plaintiffs have proposed using surveys of class members to estimate the average duration of these tasks. ECF No. 50-18, Ex. 26, ¶ 17. The Supreme Court recently upheld the use of representative evidence to prove individual injury and thus liability in the class action context,

noting that "[i]n many cases, a representative sample is 'the only practicable means to collect and present relevant data' establishing a defendant's liability." <u>Tyson Foods, Inc. v. Bouaphakeo</u>, 136 S. Ct. 1036, 1046–47 (2016) (quoting Manual of Complex Litigation § 11.493, p. 102 (4th ed. 2004)).

### 4. Typicality

In certifying a class, courts must find that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed R. Civ. P. 23(a)(3). "The purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class." <u>Hanon v. Dataproducts Corp.</u>, 976 F.2d 497, 508 (9th Cir. 1992). "Under the rule's permissive standards, representative claims are 'typical' if they are reasonably coextensive with those of absent class members; they need not be substantially identical." <u>Parsons v. Ryan</u>, 754 F.3d 657, 685 (9th Cir. 2014) (quoting <u>Hanlon</u>, 150 F.3d at 1020). "The test of typicality 'is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the Named Plaintiffs, and whether other class members have been injured by the same course of conduct.'" <u>Id.</u> (quoting <u>Hanon</u>, 976 F.2d at 508).

The named Plaintiffs' claims are typical of the class claims because all class members were subject to the same policies regarding their pay and working conditions. Virgin's only argument against typicality is that none of the named Plaintiffs principally worked in California and, as a result, their claims are not typical of any potential class members who might have a right to recover under California law. ECF No. 71 at 23.[8] As explained above, Virgin's singular emphasis on job situs is misplaced in a situation like this where employees temporarily travel out of the state in their regular course of employment. More importantly, Virgin's own arguments demonstrate that this potential defense regarding the applicability of California law will be typical of class members, all of whom are required to work throughout the country. ECF No. 71 at 7 ("Regardless of where an ITM is based or resides, given the inherent interstate nature of the job, ITM's

---

[8] Again, this argument only applies to the Plaintiffs' proposed California Resident Subclass, which the Plaintiffs admit "seeks . . . to recover for wages earned both inside and outside of California." ECF No. 84 at 12.

(including Plaintiffs themselves) work all over the United States often in a single day.").  The Court therefore finds that the Plaintiffs meet the typicality requirement.

### 5.    Adequacy

"The adequacy of representation requirement . . . requires that two questions be addressed: (a) do the Named Plaintiffs and their counsel have any conflicts of interest with other class members and (b) will the Named Plaintiffs and their counsel prosecute the action vigorously on behalf of the class?"  In re Mego Fin. Corp. Sec. Litig., 213 F.3d 454, 462 (9th Cir. 2000).  The requirement "'tend[s] to merge' with the commonality and typicality criteria of Rule 23(a)."  Amchem Prods. v. Windsor, 521 U.S. 591, 626 n.20 (1997) (quoting Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 158 n.13 (1982)).  Among other functions, the requirement serves as a way to determine whether "the Named Plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence."  Falcon, 457 U.S. at 158 n.13.

The Court finds that Plaintiffs have satisfied both prongs of Rule 23(a)(4)'s adequacy requirement.  Nothing in the record suggests that Plaintiffs have any conflict with class members, nor is there any reason to believe that either Plaintiffs or their counsel would not prosecute the action vigorously on behalf of the class.  Again, Virgin's only challenge to the adequacy of Plaintiffs and their counsel is based on their argument that the Plaintiffs did not principally work in California.  However, for the reasons explained above, the Plaintiffs will adequately represent the interests of class members in this regard because interstate travel is an inherent part of a flight attendant's job.  The Court therefore finds that Plaintiffs meet the adequacy requirement.

### 6.    Superiority

A class action must be "superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. Pro. 23(b)(3).  "The superiority inquiry under Rule 23(b)(3) requires determination of whether the objectives of the particular class action procedure will be achieved in the particular case."  Hanlon, 150 F.3d at 1023.  "[C]ertification pursuant to Rule 23(b)(3) . . . is appropriate 'whenever the actual interests of the parties can be served best by settling their differences in a single action.'"  Id. at 1022 (quoting 7A Wright & Miller, Federal

26

Practice & Procedure § 1777 (2d ed. 1986)). The four factors for the Court's examination are: (1) the interest of each class member in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already commenced by or against the class; (3) the desirability of concentrating the litigation of the claims in the particular forum; and (4) the difficulties likely to be encountered in the management of a class action. Zinser v. Accufix Research Inst., Inc., 253 F.3d 1180, 1190–92 (9th Cir.) opinion amended on denial of reh'g, 273 F.3d 1266 (9th Cir. 2001).

All of those factors weigh in favor of class certification in this instance. There is no indication that class members would have an interest in bringing individual suits. To the contrary, the pursuit of individual claims is unlikely given the relatively low potential recovery and possible fear of retaliation for initiating an individual lawsuit against an employer. See Rutti v. Lojack Corp., No. SACV 06-350 DOC JCX, 2012 WL 3151077, at *6 (C.D. Cal. July 31, 2012) ("[C]ourts have consistently recognized that the 'fear of economic retaliation' will force workers [to] 'quietly to accept substandard conditions,' dissuading employees from participating in lawsuits against their employers.") (quoting Kasten v. Saint-Gobain Performance Plastics Corp., 563 U.S. 1, 12 (2011)); Mullen v. Treasure Chest Casino, LLC, 186 F.3d 620, 625 (5th Cir. 1999) (holding that the district court "reasonably presumed that those potential class members still employer by [the defendant employer] might be unwilling to sue individually or join a suit for fear of retaliation at their jobs" such that class certification was proper). To the extent class members wish to opt out, Rule 23(b)(3) certification allows them to do so. Nor is there any evidence that parallel litigation has already been commenced by class members. And the predominance of common issues regarding Virgin's policies mean that the class action mechanism is the most efficient and cost-effective way to resolve this dispute. Indeed, proceeding on an individual rather than a class-wide basis would also create a risk of inconsistent rulings as to the legality of Virgin's policies.

Virgin's arguments regarding superiority focus exclusively on the manageability of the Plaintiff's proposed trial plan. ECF No. 71 at 32-33. However, the cases that Virgin relies on are inapt. See Zinser v. Accufix Research Inst., Inc., 253 F.3d 1180, 1189 (9th Cir.), opinion

amended on denial of reh'g, 273 F.3d 1266 (9th Cir. 2001) (finding a class action unmanageable because the plaintiff "[sought] certification of a nationwide class for which the law of forty-eight states potentially applies"); Valentino v. Carter-Wallace, Inc., 97 F.3d 1227, 1234 (9th Cir. 1996) (holding that the district court abused its discretion by certifying the class in part because the plaintiffs made "*no showing . . .* of how the class trial could be conducted") (emphasis added). Here, the Plaintiffs have made such a showing. They have proposed a manageable three-stage trial plan that would adjudicate Virgin's liability, class members' individual damages, and finally any derivative claims. ECF No. 70 at 35-36. Courts have found phased trial plans that bifurcate liability and damages to be manageable in similar circumstances. See, e.g., Ellis v. Costco Wholesale Corp., 285 F.R.D. 492, 539–40 (N.D. Cal. 2012) (finding the class action mechanism superior where the plaintiffs proposed a trial plan with separate liability and monetary relief phases to challenge the defendant's uniform policies). The Court therefore finds that class treatment is superior to the alternatives.

## CONCLUSION

The Plaintiffs' motion for class certification is granted as to the following class and subclasses:

> **Class**: All individuals who have worked as California-based flight attendants of Virgin America, Inc. at any time during the period from March 18, 2011 (four years from the filing of the original Complaint) through the date established by the Court for notice of certification of the Class (the "Class Period").

> **California Resident Subclass**: All individuals who have worked as California-based flight attendants of Virgin America, Inc. while residing in California at any time during the Class Period.

> **Waiting Time Penalties Subclass**: All individuals who have worked as California-based flight attendants of Virgin America, Inc. and have separated from their employment at any time since March 18, 2012.

/ / /

/ / /

/ / /

/ / /

The Court appoints Plaintiffs' as class representatives and appoints Duckworth Peters Lebowitz Olivier LLP and Kosinski + Thiagaraj, LLP as class counsel.

IT IS SO ORDERED.

Dated: November 7, 2016

_____
JON S. TIGAR
United States District Judge