1

2

3

4                     UNITED STATES DISTRICT COURT

5                   NORTHERN DISTRICT OF CALIFORNIA

6

7    JULIA BERNSTEIN, et al.,                 Case No.15-cv-02277-JST

8              Plaintiffs,                     **ORDER REGARDING MOTION FOR
                                               SUMMARY JUDGMENT**
9         v.
                                               Re: ECF No. 97
10   VIRGIN AMERICA, INC.,

11            Defendant.

12          Before the Court is Defendant Virgin America's motion for summary judgment.  ECF No.

13   97.  The Court will deny the motion in part and grant the motion in part.

14   **I.      BACKGROUND**

15          The Plaintiffs are flight attendants who currently work or have previously worked for

16   Defendant Virgin America, Inc. ("Virgin").  In this class action against Virgin, the Plaintiffs allege

17   that Virgin did not pay them for hours worked before, after, and between flights; time spent in

18   training; time on reserve; time spent taking mandatory drug tests; and time spent completing

19   incident reports.  See First Amended Class Action Complaint, ECF No. 32 ¶¶ 28-41.  The

20   Plaintiffs further allege that Virgin did not allow flight attendants to take meal or rest breaks,

21   failed to pay overtime and minimum wages, and failed to provide accurate wage statements.  Id.

22          **A.      Factual Summary**

23                  **1.      The Parties**

24          Virgin is an airline company that is headquartered in Burlingame, California.  Depo. of

25   Valerie Jenkins, ECF No. 44-1 at 71:4.[1]  Virgin trains its flight attendants in California, and it has

26   received millions of dollars from the State of California to do so.  ECF No. 101, Exs. 1-11.  Many

27   _____

28   [1] Throughout this Order, the Court refers to the pagination created by the Court's electronic filing
     system, not the document's internal pagination.

United States District Court
Northern District of California

of Virgin's flights either arrive to or depart from a California airport.  ECF No. 101-13.  In fact, Virgin estimates that, since 2011, the average daily number of its flights that depart from a California airport has never been less than 88.6 percent.  ECF No. 101-26 at 9.

Plaintiffs Julia Bernstein, Esther Garcia, and Lisa Marie all previously worked for or currently work for Virgin as flight attendants.  ECF No. 50-17, Exs. 23-25.  Each of the Plaintiffs provided Virgin with a California address and each of the Plaintiffs were based out of either San Francisco International Airport or Los Angeles International Airport during the course of their employment with Virgin.  Id.  The Plaintiffs' flight schedules show that they sometimes worked entire days on consecutive flights between California airports.  See ECF No. 101-17.

### 2.     Flight Attendant Scheduling Terminology and Responsibilities

Virgin schedules its flight attendants to fly "pairings," a series of flights over a series of continuous days that depart and return to the airport out of which flight attendants are based.  ECF No. 44-1, Ex. 1 at 4:10-16; ECF No. 44-1, Ex. 2 at 59:6-13.  Each pairing consists of one or more "duty periods." ECF No. 44-1, Ex. 1 at 5:18-25.  Virgin's Work Rules require that each flight attendant report for duty one hour before the departure of her first scheduled flight of the day. ECF No. 45-2, Ex. 8 at 31.  After they check in for duty, flight attendants must travel to the departure gate of their first flight and be onboard the flight no less than forty-five minutes before the scheduled departure.  ECF No. 46-2 at 18.  They must also attend two pre-flight briefings, greet and assist passengers in boarding, and generally prepare the cabin for departure.  ECF No. 47-2 at 131-134; ECF No. 47-2 at 143-146.  "Block time" is the amount of time within a duty period from when an aircraft pushes back from the gate ("block out") at its departure city to when the aircraft arrives at the gate ("block in") at its destination.  ECF No. 50-2 at 6:11-21, 8:13-21. Once the flight arrives at its destination, flight attendants help passengers deplane and check the cabin for items left onboard. ECF No. 47-2 at 177.  Flight attendants are not released from duty until fifteen minutes after their last scheduled flight of the day. ECF No. 45-3 at 2.  Sometimes a flight attendant will need to travel as a passenger on a flight to arrive at an airport for an assigned flight.  This time spent traveling is referred to as "deadheading."

When a flight attendant works a subsequent flight in a duty period, the time between the

block in of the first flight and block out of the second flight is referred to as "turn time."  As with the first flight of the day, flight attendants must report for duty at the second flight's departure gate and be onboard that flight forty-five minutes before the scheduled departure.  ECF 47-2 at 129. Flight attendants remain on duty during turn time.  ECF No. 44-1 at 93:13-20.

### 3.    Virgin's Policies Regarding Compensation and Breaks

Virgin's InFlight Work Rules outline its detailed compensation policies for flight attendants.  ECF Nos. 45-46, Exs. 8, 9, 10.  And Virgin's Crew Pay Manual is used by Virgin's payroll department to process flight attendant compensation.  ECF No. 47-3, Ex. 12.

Pursuant to those policies, Virgin uses a credit-based system to compensate its flight attendants.  ECF No. 45-4 at 12-13.  That system does not directly compensate flight attendants for all hours on duty.  ECF No. 47-3 at 8 ("Even for flying activity, crewmembers are not paid for time 'on the clock' (duty time); instead, they are typically paid only when the aircraft is moving (block time).").  Flight attendants receive an hour of credit for each hour of block time, fifty percent of block time for time spent deadheading, and a minimum of 3.5 hours of "minimum duty period credit" for duty periods in which the flight attendant does not earn at least 3.5 hours of credit from block time and/or deadheading.  ECF No. 45-4 at 12-13.  Virgin's system does not directly compensate duty hours that do not fall into one of these three categories (e.g. pre- and post-block duty time and turn time between flights).  See id.

Virgin does, however, pay flat rates for some non-flight activities.  For example, it pays flight attendants thirty minutes of pay for drug testing, regardless of the duration of the drug test. ECF No. 47-5 at 7. Virgin also pays a flat monthly rate for initial flight attendant training, irrespective of the actual hours worked by flight attendants during this training.  ECF No. 45-4 at 24.  Virgin pays flight attendants 3.5 hours of pay for annual training even though those trainings last at least eight hours.  ECF No. 45-4 at 16; ECF No. 101-20 at 2; see also, e.g., ECF No. 50-17 ¶ 22.  Virgin pays flight attendants four hours of pay for airport reserve shifts in which they are not assigned to a flight, even though those shifts can last up to six hours. ECF No. 47-5 at 9.  If a flight attendant is assigned a flight during their reserve shift, they are paid for half of the total time spent on reserve plus that flight's block time.  Id.  Virgin's compensation policy does not provide

United States District Court
Northern District of California

credit for time spent completing incident reports, which Plaintiffs testify they were unable to complete during time for which they are compensated due to their job duties (e.g. block time). ECF No. 50-17 ¶ 16.

Per Virgin's policies, crew leaders provide rest and meal periods for flight attendants. ECF No. 50-13 at 22.  However, Virgin admits that, although its flight attendants have the opportunity to take breaks, they are still on duty throughout the entirety of a flight.  ECF No. 71 at 15; ECF No. 44-1 at 96:1-6.  Many flight attendants claim that they are unable to take breaks on flights. See, e.g., ECF No. 50-17, Ex. 23, ¶ 18.  Approximately one-third of Virgin's daily flights since 2011 have been longer than five hours in duration.  ECF No. 101-26 at 6-8.

Virgin's wage statements do not indicate the duty period hours worked or the block hours worked.  ECF No. 50-2, Ex. 1 at 34:19-21, 36:17-24; ECF No. 101-23, 101-24, 101-25.

**B.      Procedural History**

The Plaintiffs commenced this action in state court, and Virgin removed it to federal court pursuant to the diversity jurisdiction provision of the Class Action Fairness Act ("CAFA").  ECF No. 1.

Plaintiffs bring claims under the California Labor Code and California Industrial Welfare Commission Wage Order 9-2001 ("Wage Order") for failure to pay minimum wage, failure to pay overtime wages, failure to pay wages for all hours worked, failure to provide required meal periods, failure to provide required rest periods, failure to provide accurate wage statements, failure to pay waiting time penalties to discharged employees, failure to indemnify all necessary business expenditures, and derivative claims under California's Unfair Competition Law ("UCL") and the Private Attorney General Act ("PAGA").  ECF No. 32.

On November 7, 2016, this Court certified the following Class and Subclasses under Rule 23(b)(3):

> **Class**: All individuals who have worked as California-based flight attendants of Virgin America, Inc. at any time during the period from March 18, 2011 (four years from the filing of the original Complaint) through the date established by the Court for notice of certification of the Class (the "Class Period").

United States District Court
Northern District of California

**California Resident Subclass**: All individuals who have worked as California-based flight attendants of Virgin America, Inc. while residing in California at any time during the Class Period.

**Waiting Time Penalties Subclass**: All individuals who have worked as California-based flight attendants of Virgin America, Inc. and have separated from their employment at any time since March 18, 2012.

See ECF No. 104.  The Class claims are limited to time worked within California.  ECF No. 70 at 10.  However, both the California Resident Subclass and the Waiting Time Penalties Subclass seek to recover wages for time spent working within and outside California.  Id.

Virgin now moves for summary judgment.  ECF No. 97.

## II.    JURISDICTION

Pursuant to the Class Action Fairness Act ("CAFA"), the Court has jurisdiction over this case, as a class action in which a member of the class of plaintiffs is a citizen of a state different from any defendant, there are more than 100 class members nationwide, and the matter in controversy exceeds the sum of $5 million, exclusive of interests and costs. 28 U.S.C. § 1332(d).

## III.   LEGAL STANDARD

Summary judgment is proper when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by" citing to depositions, documents, affidavits, or other materials. Fed. R. Civ. P. 56(c)(1)(a).  A party also may show that such materials "do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1)(B).  An issue is "genuine" only if there is sufficient evidence for a reasonable fact-finder to find for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).  A fact is "material" if the fact may affect the outcome of the case.  Id. at 248.  "In considering a motion for summary judgment, the court may not weigh the evidence or make credibility determinations, and is required to draw all inferences in a light most favorable to the non-moving party.  Freeman v. Arpaio, 125 F.3d 732, 735 (9th Cir. 1997).

Where the party moving for summary judgment would bear the burden of proof at trial, that party bears the initial burden of producing evidence that would entitle it to a directed verdict if

uncontroverted at trial.  See C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc., 213 F.3d 474, 480 (9th Cir. 2000).  Where the party moving for summary judgment would not bear the burden of proof at trial, that party bears the initial burden of either producing evidence that negates an essential element of the non-moving party's claim, or showing that the non-moving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial.  If the moving party satisfies its initial burden of production, then the non-moving party must produce admissible evidence to show that a genuine issue of material fact exists.  See Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102-03 (9th Cir. 2000).  The non-moving party must "identify with reasonable particularity the evidence that precludes summary judgment." Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir. 1996).  Indeed, it is not the duty of the district court "to scour the record in search of a genuine issue of triable fact." Id.  "A mere scintilla of evidence will not be sufficient to defeat a properly supported motion for summary judgment; rather, the non-moving party must introduce some significant probative evidence tending to support the complaint." Summers v. Teichert & Son, Inc., 127 F.3d 1150, 1152 (9th Cir. 1997) (citation and internal quotations omitted).  If the non-moving party fails to make this showing, the moving party is entitled to summary judgment.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

## IV.  ANALYSIS

Virgin argues that applying California labor law to the Plaintiffs' employment would violate both the presumption against extraterritorial application and the Dormant Commerce Clause.  Virgin further argues that the Plaintiffs' meal and rest break claims are preempted by the Federal Aviation Act and the Airline Deregulation Act.  Finally, Virgin argues that, even if California law applies, Virgin's policies and practices comply with California law and the Plaintiffs have failed to present sufficient evidence to prevail on their claims.

### A.    Application of California's Labor Laws

#### 1.    Job Situs is Not Dispositive

As it did when opposing class certification, Virgin again argues that California labor law does not protect the Plaintiffs because they do not work "exclusively or principally" in California, but rather across "multiple jurisdictions" and "in the federally regulated airspace."  ECF No. 97 at

United States District Court
Northern District of California

19-22.  Virgin claims that this "job situs" test is "determinative."  Id.

The Court again rejects Virgin's singular emphasis on job situs as the dispositive factor to determine whether California's wage and hour laws apply to Plaintiffs.  See ECF No. 104 at 14–17.  As explained at length in the class certification order, Virgin's position lacks relevant support in the case law.  See id.

Virgin relies primarily on Tidewater Marine W., Inc. v. Bradshaw, 14 Cal. 4th 557, 577 (1996) for the proposition that an employee must work "exclusively or principally" in California to benefit from California law.  See id.  But that is not what Tidewater says.  The Tidewater court simply explained that an employee who "resides in California, receives pay in California, and works exclusively, or principally, in California," presumptively enjoys the protections of California's wage orders.  Tidewater, 14 Cal. 4th at 578.   That court did not hold that an employee must necessarily satisfy all three of those conditions to be protected by California law.  See id.  In fact, because the Tidewater court ultimately found that the plaintiffs worked within California's territorial boundaries, it "express[ed] no opinion as to whether the trial court can enjoin the application of IWC wage orders to crew members who work primarily outside California's state law boundaries."  Tidewater, 14 Cal. 4th at 578-79.  The Court also left room for the possibility that California's labor laws may apply extraterritorially "in limited circumstances, such as when California residents working for a California employer travel temporarily outside the state during the course of the normal workday but return to California at the end of the day."  Id. at 577-78.  Despite the Tidewater court's explicit refusal to decide the precise issue presented here, Virgin relies on that case to argue that Plaintiffs' can only enjoy the protections of the California Labor Code if they worked exclusively or principally in California.  Tidewater simply cannot bear the weight Virgin asks of it.

Lacking sufficient support from the California Supreme Court, Virgin again turns to three federal district court cases to find support for its dispositive "job situs" test.  Because the Court has already explained at length why those cases are factually distinguishable and legally erroneous, it does not address them again here.  See ECF No. 104 at 14–17.

Instead of considering principal "job situs" in a vacuum, the California Supreme Court has

endorsed a multi-faceted approach.  The California Supreme Court's later decision in <u>Sullivan</u> confirms that the three factors listed in <u>Tidewater</u> – i.e. California residency, receipt of pay in California, and exclusive or principal "job situs" in California – are sufficient, but not necessary, conditions for an individual to benefit from the protections of California law.  After all, the <u>Sullivan</u> court's central holding was that *non-residents* (who do not presumptively enjoy the protections of California's labor laws) are nonetheless protected by those laws in certain circumstances.  <u>Sullivan</u>, 51 Cal. 4th at 1194.  The court also suggested that other factors were relevant to this inquiry, such as the employer's residency and whether the employee's absence from the state was temporary in nature.  <u>See</u> <u>id</u>. at 1199–1200 ("California law . . . might follow California resident employees of California employers who leave the state 'temporarily . . . during the course of the normal workday' . . . [n]othing in <u>Tidewater</u> suggests a nonresident employee, *especially a nonresident employee of a California employer such as Oracle*, can enter the state for entire days or weeks without the protection of California law.") (emphasis added).  <u>Sullivan</u> therefore flatly rejects the simplistic test proposed by Virgin.

This multi-faceted approach is consistent with California's strong public policy of protecting its workers.  The <u>Sullivan</u> court stressed that the wage and hour laws "serve important public policy goals" and therefore they should be applied in a way that would not encourage employers to evade the law.  <u>Sullivan</u>, 51 Cal. 4th at 1198.  On another occasion, the California Supreme Court explained that "in light of the remedial nature of the legislative enactments authorizing the regulation of wages, hours and working conditions for the protection and benefit of employees, the statutory provisions are to be liberally construed with an eye to promoting such protection."  <u>Indus. Welfare Com. v. Superior Court</u>, 27 Cal. 3d 690, 702 (1980).

As applied to this case, the Court finds that Plaintiffs' and Virgin's significant connections to California are also relevant considerations when determining whether to apply California's wage and hour laws.  The Plaintiffs were California residents[2] who received their pay in California

---

[2] Although Virgin disputes whether Bernstein was actually living in California, <u>see</u> ECF No. 97 at 21, n. 23, the fact that she provided a California address for payroll and tax purposes in 2011 is sufficient to create a triable factual issue regarding her residency.

United States District Court
Northern District of California

and, therefore, they satisfy two of the three elements to presumptively enjoy the protections of California law under Tidewater.  In addition, Virgin is a California-based airline with its headquarters in California.  See Sullivan, 51 Cal. 4th at 1200 (suggesting that the employer's residency is relevant to the application of California law).  The Plaintiffs have presented evidence that Virgin has received millions of dollars in state subsidies to train all of its flight attendants in California.  See ECF No. 101, Exs. 3–7.  And the Plaintiffs' expert calculates that, since 2011, between 88 and 99 percent of Virgin's flights each day either departed from or arrived in a California airport.  ECF No. 101–38, ¶¶ 3–4.  The parties' deep ties to California can hardly be described as "minor considerations" for a court determining whether to apply California law.  ECF No. 97 at 19-22.  And, although the Plaintiffs spent just around a quarter of their total work time in California, that consideration is relatively less important where, as here, temporary out-of-state travel is an inherent part of their job.  Tidewater, 14 Cal. 4th at 577–78 (distinguishing temporary out-of-state travel).

Given Virgin's thin precedential support for its position that "job situs" is determinative, the other compelling considerations present in this case, and California's strong public policy of protecting its workers, the Court concludes that the Plaintiffs are not barred from asserting claims under California's wage and hour laws simply because they did not work exclusively or principally in California.

### 2. The California Labor Code Applies to Work Performed in California and Wrongful Conduct that Occurred in California

Virgin also argues that the Plaintiffs cannot seek protection of the California Labor Code for work that they performed outside of the state due to the presumption against the extraterritorial application of California law.  See ECF No. 97 at 19.

At the outset, it is important to stress that many of the Plaintiffs' claims relate to work performed within California's borders to which California law clearly applies.  For example, one of the Plaintiffs' primary allegations is that they were not paid for time spent working before takeoff and after landing in California airports.[3]  ECF No. 32 ¶¶ 31, 46.  The Plaintiffs further

---

[3] The Plaintiffs' expert report shows that at least 88 percent of Virgin's flights each day either

United States District Court
Northern District of California

allege that they were not paid for time spent in training and on reserve shifts that occurred in California.  Id. ¶¶ 23-26, 35, 46.  Virgin does not seriously dispute that such "non-flight activities exclusively preformed [sic] in California might be subject to California law."  ECF No. 107 at 9, n. 8.[4]  Nor could it.

Both the plain terms of the California Labor Code and California Supreme Court precedent confirm that the California Labor Code applies to work performed in California.  The preamble to California's Labor Code provides that its protections "are available to all individuals . . . who have applied for employment, or who are or who have been employed, in this state."  Cal. Lab. Code § 1171.5(a).[5]  The specific Labor Code provisions at issue in this case similarly apply to all work performed in California.  See, e.g., Cal. Lab. Code § 1174 ("Every person employing labor *in this state* shall . . . ") (emphasis added).

Based on this clear statutory text, the California Supreme Court has concluded that California's overtime laws "speak broadly" to "regulate all nonexempt overtime work *within its borders*."  Sullivan v. Oracle Corp., 51 Cal. 4th 1191, 1197-98 (2011) (emphasis added) ("California's overtime laws apply by their terms to all employment in the state."); Sullivan v. Oracle Corp. ("Sullivan II"), 662 F.3d 1265, 1271 (9th Cir. 2011) ("California applies its Labor Code equally to *work performed in California*, whether that work is performed by California residents or by out-of-state residents.") (emphasis added).  This is true even if the individual seeking the protection of California law "worked mainly" in other states.  See Sullivan, 51 Cal. 4th at 1197, 1194-95 (holding that California overtime laws applied to plaintiff's work performed in California even though he spent just twenty days working in California during a three-year

arrived at or departed from California airports.  ECF No. 101–38, ¶¶ 3–4.  In some years, this percentage reached 99 percent.  Id.

[4] Although Virgin appears to concede this point as a matter of legal "theory," it nonetheless argues that the Plaintiffs have not provided sufficient evidence to prevail on such a theory in this particular case (i.e. because they have not shown that they worked enough hours in California to trigger overtime protections).  See id.  The Court addresses these alleged factual shortcomings later in its order.

[5] Although the original impetus for § 1171.5 was to extend protections to non-resident, undocumented workers in California, the provision has a broader reach because it was "codified as a general preamble to the wage law" and it "broadly refers to 'all individuals' employed in the state."  Sullivan, 51 Cal. 4th at 1197-98, n. 3.

period); Wright v. Adventures Rolling Cross Country, Inc., No. C-12-0982-EMC at *5-6 (N.D. Cal., May 3, 2012) (holding at the motion to dismiss stage that "Plaintiffs do have viable state law claims based on their work done in California," such as training, even though they did most of their work abroad as international trip leaders). The Court therefore concludes that California's labor laws apply to the work performed by the Plaintiffs in California.

Still, the Plaintiffs must overcome the presumption against extraterritorial application to the extent they seek to recover based on work performed *outside* of California. California law presumptively does not apply to conduct that occurs outside of California. See N. Alaska Salmon Co. v. Pillsbury, 174 Cal. 1, 4 (1916) (internal quotation marks omitted) ("Ordinarily, the statutes of a state have no force beyond its boundaries."). To overcome that presumption, the Plaintiffs must show that a contrary intent "is clearly expressed or reasonably to be inferred from the language of the act or from its purpose, subject-matter, or history." Id.

Instead of trying to overcome the presumption by pointing to the relevant statutory language or legislative history, Plaintiffs seek to avoid the presumption against extraterritorial application altogether by arguing that the alleged wrongful conduct giving rise to liability occurred within California. See ECF No. 102 at 18. The Plaintiffs argue that, "even if a presumption against extraterritorial application applies generally to the Labor Code," the Court must still "consider whether plaintiffs' proposed application of the [law] would cause it to operate, impermissibly, with respect to occurrences outside the state." Id. (quoting Sullivan, 51 Cal. 4th at 1207). The Plaintiffs claim that the wrongful conduct alleged here occurred in California because Virgin is headquartered in California, Virgin oversees its flight attendants and issues payroll from California, the Plaintiffs are California residents who were based out of California airports, and the Plaintiffs performed at least some of their work in California on most workdays. ECF No. 102 at 19.

Even if the presumption against extraterritorial application applies to a particular statute, the court must still consider "whether plaintiffs' proposed application of the [law] would cause it to operate, impermissibly, with respect to occurrences outside the state." Sullivan, 51 Cal. 4th at 1207; see also, e.g., Leibman v. Prupes, No. 2:14-CV-09003-CAS (VBKx), 2015 U.S. Dist.

LEXIS 80101, at *15-18 (C.D. Cal. June 18, 2015) ("assuming *arguendo* that the presumption [against extraterritorial application] applies to common law claims," but holding that the plaintiff's "claims do not constitute improper extraterritorial application of California law" because "the actions which gave rise to liability" occurred in California). This inquiry is necessary because the presumption against extraterritorial application does not bar the application of California law to wrongful conduct that occurs within California. Diamond Multimedia Sys., Inc. v. Superior Court, 19 Cal. 4th 1036, 1059 (1999) ("The presumption [against extraterritorial application] has never been applied to an injured person's right to recover damages suffered as a result of an unlawful act or omission committed in California."); Aguilar v. Zep Inc., No. 13-CV-00563-WHO, 2014 WL 4245988, at *11 (N.D. Cal. Aug. 27, 2014) ("[E]xtraterritorial application of California law is not barred where the alleged wrongful conduct occurred in California.").

To determine whether a state law is being applied extraterritorially, courts consider "whether 'the conduct *which gives rise to liability* . . . occurs in California.'" Leibman v. Prupes, No. 2:14-CV-09003-CAS, 2015 U.S. Dist. LEXIS 80101, at *15–17 (C.D. Cal. June 18, 2015) (emphasis in original) (quoting Diamond Multimedia, 19 Cal. 4th at 1059). For example, the presumption against extraterritoriality did not bar the plaintiff's breach of contract claim where "the actions which gave rise to liability – that is, the alleged breach – occurred in California" when the business manager made the "'core decision' to wrongfully terminate [the plaintiff]" and terminated the plaintiff via email from his business in California. No. 2:14-CV-09003-CAS, 2015 U.S. Dist. LEXIS 80101, at *17–18 (C.D. Cal. June 18, 2015). Similarly, the presumption against extraterritorial application did not bar the out-of-state plaintiffs' consumer protection and false advertising claims under California law where the plaintiffs "alleged that [defendant's] purportedly misleading marketing, promotional activities and literature were coordinated at, emanate from and are developed at its California headquarters, and that all 'critical decisions' regarding marketing and advertising were made within the state." In re iPhone 4S Consumer Litig., No. C 12-1127 CW, 2013 U.S. Dist. LEXIS 103058, at *23-24 (N.D. Cal. July 23, 2013). Likewise, there was no extraterritorial application of California's consumer protection statutes where the plaintiffs alleged "that the misrepresentations were developed in California, contained

12

on websites and an application that are maintained in California, and that billing and payment of services went through servers located in California." Ehret v. Uber Techs., Inc., 68 F. Supp. 3d 1121, 1132 (N.D. Cal. 2014).  Therefore, the key question is whether the alleged wrongful conduct that gave rise to liability occurred within California.  If so, the presumption against extraterritorial application does not apply.

The Court concludes that the wrongful conduct giving rise to liability occurred in California such that the Plaintiffs' claims do not constitute an attempt to apply the law to occurrences outside of the state.  Plaintiffs challenge Virgin's centrally devised compensation policies, such as its policies of not compensating flight attendants for non-block duty time and paying flat rates for drug testing and training activities.  See generally ECF No. 32; ECF Nos. 45, 46, 47–3 (outlining Virgin's detailed compensation policies for flight attendants).  As in the above cases, Virgin made these critical decisions regarding how it would pay its flight attendants, and proceeded to pay its flight attendants in accordance with those decisions, from its headquarters in Burlingame, California.  Therefore, the very actions giving rise to potential liability – that is, the failure to pay for all hours worked, the failure to pay overtime, the failure to provide accurate wage statements, and the failure to pay waiting time penalties to discharged employees – occurred in California.  Because the Plaintiffs' proposed application of the law would not impermissibly operate to reach conduct occurring outside of the state, the presumption against extraterritorial application does not apply and the Plaintiffs do not have to overcome it.

The only wrongful conduct that could have potentially occurred outside of California, at least in some instances, is Virgin's alleged failure to provide meal periods and rest breaks.  Virgin does not have a centralized policy regarding the provision of such breaks; instead, Virgin's policies simply provide that team leaders are responsible for scheduling breaks for flight attendants.  ECF No. 50–13 at 22.  Therefore, any failure to provide meal and rest breaks did not originate at Virgin's headquarters in California, but rather occurred wherever the flight attendant was deprived of that break.  In some instances, the Plaintiffs might have been deprived of such breaks outside of California, for example while they were working on flights between California and the East coast.  See id. ¶ 23.  To the extent the Plaintiffs seek to recover for such break

13

1   violations that occurred outside of California, they must overcome the presumption against

2   extraterritorial application.  Because the Plaintiffs have not attempted to do so, they cannot recover

3   for that extraterritorial conduct under California law.

4          However, the Court nonetheless declines to grant summary judgment to Virgin on the meal

5   and rest break claims because there is sufficient evidence that the Plaintiffs were deprived of at

6   least some of those breaks while working in California.  See ECF No. 101–17 at 2 (showing days

7   on which Plaintiffs Esther Garcia and Lisa Smith flew back and forth between Los Angeles, San

8   Francisco, and San Diego); ECF No. 98–2 at 6–7 (concluding that the Plaintiffs were sometimes

9   eligible for meal periods or rest breaks based on the length of their pairings); ECF No. 50–17, ¶¶

10  18–19 (Plaintiff Bernstein declaring that she "cannot remember ever being encouraged or directed

11  to take a break or meal period" and that she does not remember taking a meal period during turn

12  time between flights).  Therefore, the Court cannot conclude as a matter of law that the break

13  claims solely involve extraterritorial conduct such that California law may not apply to those

14  claims.  Aguilar, 2014 WL 4245988, at *12 ("Summary judgment is not proper to the extent

15  [plaintiff] can prove that [defendant] violated California laws relating to work that he performed

16  within California.").

17         **B.      Dormant Commerce Clause**

18         Second, Virgin argues that requiring it to comply with California's labor laws would

19  violate the Dormant Commerce Clause.  ECF No. 97 at 22–25.

20         The United States Constitution's Commerce Clause grants Congress the authority "[t]o

21  regulate Commerce with foreign Nations, and among the several States, and with the Indian

22  Tribes[.]"  U.S. CONST. art. I, § 8, cl. 3.  Because the framers gave the federal government the

23  exclusive power to regulate interstate commerce, and because federal law preempts state law, the

24  United States Supreme Court has inferred the existence of a "dormant" Commerce Clause that

25  limits states' abilities to restrict interstate commerce.  See New Energy Co. v. Limbach, 486 U.S.

26  269, 273 (1988) (explaining that the Commerce Clause "not only grants Congress the authority to

27  regulate commerce among the States, but also directly limits the power of the States to

28  discriminate against interstate commerce[]").

United States District Court
Northern District of California

14

United States District Court
Northern District of California

At the same time, the Dormant Commerce Clause "respects federalism by protecting local autonomy." Nat'l Ass'n of Optometrists & Opticians v. Harris, 682 F.3d 1144, 1148–49 (9th Cir. 2012). "Thus, the Supreme Court has recognized that 'under our constitutional scheme the States retain broad power to legislate protection for their citizens in matters of local concern such as public health' and has held that 'not every exercise of local power is invalid merely because it affects in some way the flow of commerce between the States.'" Id. (quoting Great Atl. & Pac. Tea Co. v. Cottrell, 424 U.S. 366, 371 (1976) (internal quotations and citations omitted)).

There are two ways in which a state regulation may violate the Dormant Commerce Clause. First, a state regulation is virtually *per se* invalid under the Dormant Commerce Clause if it discriminates against out-of-state entities. Dep't of Revenue v. Davis, 553 U.S. 328, 337 (2008); Int'l Franchise Ass'n, Inc. v. City of Seattle, 803 F.3d 389, 399 (9th Cir. 2015), cert. denied sub nom. Int'l Franchise Ass'n, Inc. v. City of Seattle, Wash., 136 S. Ct. 1838 (2016). Indeed, "[m]odern dormant Commerce Clause jurisprudence primarily 'is driven by concern about economic protectionism – that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.'" Harris, 682 F.3d at 1148 (quoting Davis, 553 U.S. at 337). Accordingly, "[m]ost regulations that run afoul of the dormant Commerce Clause do so because of discrimination. . . . " Harris, 682 F.3d at 1148. Virgin does not argue that the California wage and hour laws at issue here discriminate against out-of-state entities in this way. See ECF No. 97 at 22–25.

Second, a state regulation that "regulates even-handedly to effectuate a legitimate local public interest" and whose "effects on interstate commerce are only incidental" may nonetheless violate the Dormant Commerce Clause if "the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." Sullivan v. Oracle Corp., 662 F.3d 1265, 1271 (9th Cir. 2011) (internal quotation marks omitted) (quoting Pike v. Bruce Church, Inc., 397 U.S. 137, 142 (1970)). Importantly, "a state regulation does not become vulnerable to invalidation under the dormant Commerce Clause merely because it affects interstate commerce." Harris, 682 F.3d at 1148. "A critical requirement for proving a violation of the dormant Commerce Clause is that there must be a *substantial burden on interstate commerce.*" Id. (emphasis in original).

United States District Court
Northern District of California

1    Courts have only struck down non-discriminatory state regulations "in a small number of dormant

2    Commerce Clause cases," Harris, 682 F.3d at 1148, and "[s]tate laws frequently survive this *Pike*

3    scrutiny," Davis, 553 U.S. at 339 (citing cases).  Virgin bears the burden of showing that the

4    application of California's Labor Code would violate the Dormant Commerce Clause.  Int'l

5    Franchise Ass'n, Inc. v. City of Seattle, 803 F.3d 389, 400 (9th Cir. 2015), cert. denied sub nom.

6    Int'l Franchise Ass'n, Inc. v. City of Seattle, Wash., 136 S. Ct. 1838 (2016) (internal quotation

7    marks and citations omitted).

8        Virgin argues that, if it is forced to comply with the California Labor Code, it will

9    necessarily have to comply with other states' wage and hour laws, too.  ECF No. 97 at 22.  As a

10   result, it argues, "[a]pplication of the state regulations at issue would subject Virgin to an ever

11   changing national patchwork of wage and hour law, and therefore places an undue burden on

12   interstate commerce" that outweighs California's interest in protecting its employees.  ECF No.

13   107 at 14.  Virgin further argues that the need for uniform regulation is especially important in the

14   airline industry, which is inherently national.  ECF No. 97 at 23.  Finally, Virgin argues that it will

15   incur substantial costs if required to comply with the California Labor Code.  ECF No. 120 at 4.

16       As a preliminary matter, the Court rejects Virgin's premise that it will necessarily be

17   required to comply with each state's wage and hour laws.  As explained above, Virgin is subject to

18   California law because both Virgin and the Plaintiffs have deep ties to California and the wrongful

19   conduct at issue in this case occurred in California.  Regardless of where their employees' pairings

20   take them, the challenged compensation policies at issue in this case emanated from Virgin's

21   headquarters in California and Virgin paid its flight attendants pursuant to those policies in

22   California.  Nothing in the record suggests that Virgin has similar ties to other states, and Virgin

23   has presented no evidence to support its contention that it will be required to comply with other

24   states' laws.  See S.D. Myers, Inc. v. City & Cty. of San Francisco, 253 F.3d 461, 471 (9th Cir.

25   2001) (rejecting a Dormant Commerce Clause challenge where the party challenging the state

26   regulation "relied solely on conclusory statements about the burden the [state regulation] has on

27   interstate commerce," and explaining that the court "require[s] specific details as to how the costs

28   of the [state regulation] burdened interstate commerce").  Absent such evidence, this Court cannot

16

conclude that Virgin will automatically be forced to comply with the state laws in whatever jurisdiction their flight attendants happen to pass through on a given day.  Rather, Virgin is simply being required comply with the law of the state where it chose to headquarter its business, where its California-resident employees performed work based out of California airports, and where it made critical decisions regarding how it would compensate its employees that are now being challenged in this lawsuit.  Virgin's suggestion that the Court's ruling will "have far-reaching implications," like subjecting an employer to California law because their employee "simply work[ed] for three hours in the SFO terminal while waiting for a connecting flight between New York and Japan," completely ignores all of the compelling considerations that weigh in favor of applying California law in this case. ECF No. 97 at 25, n. 28.

Absent this flawed premise, Virgin's argument regarding its administrative burden falls apart.  Virgin relies heavily on <u>Ward</u>, but that court's conclusion that the application of California's Labor Code would impose an undue administrative burden on the airline was entirely dependent on its erroneous conclusion that California law only applies to individuals who work principally or exclusively in California.  Based on that incorrect interpretation of California law, the <u>Ward</u> court concluded that the airline would have to "monitor the pilot's precise hours spent working in each state and determine which state's laws applied in that bid period."  <u>Ward</u>, 2016 WL 3906077 at *5.  Then, the airline would have to "give an individual pilot a different form of wage statement in each bid period, depending on whether that pilot worked principally in California or some other state."  <u>Id</u>.[6]  In contrast, this Court has already determined that principal job situs is *not* dispositive of whether California law applies to the Plaintiffs, therefore eliminating any need to monitor each flight attendant's work schedule each month to determine where they principally worked.  As explained above, both the Plaintiffs and Virgin have significant

---

[6] The <u>Ward</u> court also failed to analyze whether state laws regarding wage statements actually conflicted such that the airline would need to provide different wage statements for different states.  In doing so, the court neglected to hold the airline to its burden of showing that compliance would impose a substantial burden.  <u>See Int'l Franchise Ass'n, Inc.</u>, 803 F.3d 389.  Plaintiffs here have presented a thorough analysis of state-by-state wage statement requirements which suggests that a wage statement that complies with California law would comply with almost all state laws, thus mitigating any burden.  ECF No. 101–15.

United States District Court
Northern District of California

1   connections to California, the California Labor Code clearly applies to the Plaintiffs' work

2   performed in California, and the wrongful conduct at issue in this case occurred in California.

3   Because Plaintiffs do not seek to apply the California Labor Code extraterritorially, the

4   administrative burden that was present in <u>Ward</u> is not present in this case.

5   　　　Perhaps most importantly, the Ninth Circuit has already rejected a similar Dormant

6   Commerce Clause to California's Labor Code.  <u>See</u> <u>Sullivan v. Oracle Corp.</u>, 662 F.3d 1265, 1271

7   (9th Cir. 2011).  Oracle, the California employer in <u>Sullivan</u>, argued that "[i]f California decides to

8   impose its Labor Code on business travelers, other states may follow suit" and "[t]he resulting

9   patchwork of conflicting state laws would have severe adverse impact on interstate commerce,

10  resulting in an administrative burden as employers attempted to comply with varying state laws."

11  Brief for Appellee Oracle Corporation, <u>Sullivan v. Oracle Corp.</u>, 2007 WL 2317029 (C.A.9).  The

12  Ninth Circuit squarely rejected this argument, explaining that "California applies its Labor Code

13  equally to work performed in California, whether that work is performed by California residents or

14  by out-of-state residents."  <u>Sullivan</u>, 662 F.3d at 1271.  As result, the Court explained, "[t]here is

15  no plausible Dormant Commerce Clause argument when California has chosen to treat out-of-state

16  residents equally with its own."  <u>Id</u>.  <u>Sullivan</u> therefore confirms that California's Labor Code

17  "regulates even-handedly to effectuate a legitimate local public interest" such that it will be upheld

18  unless Virgin shows that the burden it imposes on interstate commerce "is clearly excessive in

19  relation to the putative local benefits.'"  <u>Id</u>.

20  　　　The only potential difference between this case and <u>Sullivan</u> is that this case involves the

21  airline industry.  It is true that a state regulation "that imposes significant burdens on interstate

22  transportation" represents the kind of "inconsistent regulation of activities that are inherently

23  national or require a uniform system of regulation."  <u>Harris</u>, 682 F.3d at 1148.  The question then

24  becomes what uniform system of regulation Virgin is currently subject to and whether the

25  application of the California Labor Code is inconsistent with that system.

26  　　　Virgin suggests that the Fair Labor Standards Act (FLSA) already provides a uniform,

27  albeit "baseline," system of regulation for employment in the airline industry.  See ECF No. 107 at

28  15–16.  But Virgin completely fails to explain how the application of California's Labor Code

18

United States District Court
Northern District of California

would conflict with FLSA and thereby disrupt the uniform system of regulation.[7]  The only

potential conflict that Virgin identifies between the FLSA and California law is that the FLSA

allows averaging to satisfy minimum wage requirements, whereas California law does not.  ECF

No. 97 at 24–25.  However, the FLSA specifically contemplates continued state regulation of

employees' working conditions.  See 29 U.S.C.A. § 218(a) ("No provision of this chapter or of

any order thereunder shall excuse noncompliance with any . . . State law or municipal ordinance

establishing a minimum wage higher than the minimum wage established under this chapter or a

maximum work week lower than the maximum workweek established under this chapter . . . ").

Through FLSA's savings clause, Congress "made clear its intent not to disturb the traditional

exercise of the states' police powers with respect to wages and hours more generous than the

federal standards." Pac. Merch. Shipping Ass'n v. Aubry, 918 F.2d 1409, 1421 (9th Cir. 1990)

(explaining that California's overtime provisions supplemented FLSA's protections and holding

that California's overtime laws applied to maritime workers working on the high seas).  In other

words, "the purpose behind the FLSA is to establish a national *floor* under which wage protections

cannot drop, not to establish absolute uniformity in minimum wage and overtime standards

nationwide at levels established in the FLSA." Id. at 1425 (emphasis in original).  Because the

FLSA and the California Labor Code were intended to coexist, the application of California law is

not inconsistent with the national system of regulation under FLSA.[8]

     The lack of a conflict between the FLSA and the California Labor Code distinguish this

---

[7] Again, the primary disruption to national uniformity that Virgin identifies is the supposed
conflict between California law and the laws of other states, such as New York and Florida.  See
ECF No. 97 at 24.  For the reasons provided above, the Court rejects Virgin's assumption that it
will be subject to every state's wage and hour laws simply because it is subject to California law.

[8] Contrary to Plaintiffs' assertion, FLSA's savings clause does not constitute a delegation of
Congressional authority to the states to regulate an area of interstate commerce.  See ECF No. 102
at 26.  As the Ninth Circuit explained in Pacific Merchant, "Congress did not 'delegate' authority
to the states through section 218, but simply made clear its intent not to disturb the traditional
exercise of the states' police powers with respect to wages and hours more generous than the
federal standards." Pacific Merchant, 918 F.2d at 1421.  Therefore, California's wage and hour
laws are not completely "invulnerable" to a Dormant Commerce Clause challenge.  Cf. W. & S.
Life Ins. Co. v. State Bd. of Equalization of California, 451 U.S. 648, 652–55 (1981).

United States District Court
Northern District of California

1  case from the small number of cases in which the Supreme Court has held that a state regulation is

2  unconstitutional because it imposes an undue burden on interstate transportation.  Virgin argues

3  that California's prohibition against averaging to satisfy minimum wage requirements is akin to

4  the state regulation at issue in Bibb v. Navajo Freight Lines, Inc., 359 U.S. 520 (1959).  ECF No.

5  107 at 14–15.  In Bibb, the Supreme Court held that an Illinois statute that required trucks to use

6  curved mudguards placed an unconstitutional burden on interstate commerce because it directly

7  conflicted with an Arkansas statute that required truck drivers to use straight mudguards.  Bibb,

8  359 U.S. at 527.  The conflict between the two statutes required truck drivers to change their

9  mudguards when crossing state lines, a process that caused significant delay and posed safety risks

10 because the mudguards were welded on.  See id.  The Supreme Court similarly struck down an

11 Arizona law that restricted the number of cars on trains that traveled interstate because it required

12 railroads to break up and remake long trains upon entering and leaving the Arizona.  S. Pac. Co. v.

13 State of Ariz. ex rel. Sullivan, 325 U.S. 761 (1945).  Unlike the state regulations at issue in Bibb

14 and Southern Pacific, California's Labor Code does not conflict with the FLSA.  Rather, as

15 explained by the Ninth Circuit in Pacific Merchant Shipping, California law supplements the

16 FLSA's baseline wage and hour requirements.  And requiring Virgin to pay its California

17 employees in accordance with California law simply does not impede the flow of interstate

18 transportation like the regulations at issue in Bibb and Pacific Merchant.  As the Plaintiffs

19 persuasively argue, "Virgin's aircrafts take off and land on schedule regardless of its pay policies."

20 ECF No. 102 at 28.

21     Virgin also relies on United Air Lines, Inc. v. Indus. Welfare Com., a 1963 California

22 Court of Appeals decision that was later overruled on other grounds.  United Air Lines, Inc. v.

23 Indus. Welfare Comm'n, 211 Cal. App. 2d 729, 747 (Ct. App. 1963) disapproved of by Indus.

24 Welfare Com. v. Superior Court, 27 Cal. 3d 690, 728, n.15 (1980).  In that case, the court held that

25 a California wage regulation that required the defendant airline to pay for their flight attendant's

26 uniforms would pose an undue burden on interstate commerce.  See id. at 747–49.  The only

27 burden that the court could identify was the "personnel troubles" that would result if some flight

28 attendants had to pay for their uniforms and others did not.  Id.  Tellingly, the court admitted that

20

"that burden may not be very great." Id. Nonetheless, the court held that the regulation violated the Dormant Commerce Clause because "the subject is one which necessarily requires uniformity of treatment." Id. The Court does not find this case persuasive because (1) controlling United States Supreme Court and Ninth Circuit precedent require a "substantial burden," and (2) the application of the California Labor Code would not disrupt national uniformity in this case because Congress intended for state law to supplement the FLSA. See Harris, 682 F.3d at 1148 (citing S.-Cent. Timber Dev., Inc. v. Wunnicke, 467 U.S. 82, 87 (1984)).[9]

Finally, Virgin argues that it will incur additional staffing costs if required to comply with California's meal break requirements. ECF No. 120 at 4-5. But the "administrative costs of compliance, alone, are generally insufficient to be deemed an unconstitutional burden." Barclays Bank Internat. Ltd. v. Franchise Tax Bd., 10 Cal.App.4th 1742, 1755 (1992) (citing Bibb, 359 U.S. at 526), aff'd sub nom. Barclays Bank PLC v. Franchise Tax Bd. of California, 512 U.S. 298, 310 (1994); see also, e.g., Burlington Northern R. Co. v. Department of Public Service Regulation, 763 F.2d 1106, 1114 (9th Cir. 1985) (rejecting a Dormant Commerce Clause challenge to a Montana statute that required a railroad to maintain and staff freight offices in towns with at least 1,000 persons, noting that "a loss to the company does not, without more, suggest that the Montana statute 'impede[s] substantially the free flow of commerce from state to state'") (quoting Southern Pacific, 325 U.S. at 767). Virgin argues that its compliance costs—an estimated $1,950,925 annually[10]—are significantly greater than those at issue in Barclays and Burlington. ECF No. 120 at 5. But the Ninth Circuit also rejected a Dormant Commerce Clause challenge to California's vessel fuel rules, even though compliance with those rules would cost the industry an additional $360 million annually. Pacific Merchant Shipping Ass'n v. Goldstene, 639 F.3d 1154, 1159, 1177-82 (9th Cir. 2011). In doing so, the Court noted that the cost of compliance "would appear to be relatively small in comparison with the overall cost of a trans-Pacific voyage." Id.

---

[9] Virgin also relies on an unpublished, uncitable decision. See ECF No. 97 at 23 (relying on Guy v. IASCO, 2004 WL 1354300 (Cal. App. 2d June 17, 2004). This Court does not address that decision.

[10] This estimate reflects the cost of paying an additional flight attendant the lowest base rate ($20/hour) for every flight that lasts five hours. ECF No. 120 at 4-5.

United States District Court
Northern District of California

Virgin's compliance costs—$100 per flight according to Virgin's estimate—are also relatively small compared to the overall cost of a flight.

In sum, Virgin has failed to show that the burden on interstate commerce imposed by the California Labor Code is "clearly excessive in relation to the putative local benefits." Pike, 397 U.S. at 142. Virgin relies heavily on the professed conflict between California law and other states' laws to argue that there is an administrative burden, but this argument hinges on its faulty assumption that it will be subject to the wage and hour laws of other states' simply because it is subject to California law. Virgin also relies on the fact that it operates within the national airline industry, but there is no conflict between the existing system of federal regulation (the FLSA) and the California Labor Code because Congress intended state regulations to supplement the FLSA's minimum requirements. Contrasted against the speculative burden of having to comply with various states' employment laws are the significant local benefits conferred by the wage and hour provisions at issue in this lawsuit, which ensure that workers are paid for all hours worked. Because these local benefits outweigh any potential burden on interstate commerce, there is no Dormant Commerce Clause violation.

### C.     Federal Preemption of Plaintiffs' Meal and Rest Break Claims

Third, Virgin argues that Plaintiffs' meal and rest break claims are preempted by the Federal Aviation Act ("FAA") and/or the Airline Deregulation Act ("ADA"). ECF No. 97 at 26–29.

"Preemption analysis begins with the 'presumption that Congress does not intend to supplant state law.'" Tillison v. Gregoire, 424 F.3d 1093, 1098 (9th Cir. 2005) (quoting N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., 514 U.S. 645, 654 (1995)). In particular, the Supreme Court has warned that "[p]re-emption of employment standards 'within the traditional police power of the State' 'should not be lightly inferred.'" Hawaiian Airlines, Inc. v. Norris, 512 U.S. 246, 252 (1994) (quoting Fort Halifax Packing Co. v. Coyne, 482 U.S. 1, 21 (1987)).

However, this presumption is overcome where Congress expresses a "clear and manifest" intent to preempt state law. Californians For Safe & Competitive Dump Truck Transp. v.

22

Mendonca, 152 F.3d 1184, 1186 (9th Cir. 1998).  "Congress' intent may be 'explicitly stated in the statute's language or implicitly contained in its structure and purpose.'"  Montalvo v. Spirit Airlines, 508 F.3d 464, 470 (9th Cir. 2007) (internal quotation marks omitted).  "There are two types of implied preemption: conflict preemption and field preemption."  Id.  "Courts may find conflict preemption when a state law actually conflicts with federal law or when a state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress in enacting the federal law."  Id.  "Implied preemption exists when federal law so thoroughly occupies a legislative field 'as to make reasonable the inference that Congress left no room for the States to supplement it.'"  Id. (quoting Cipollone v. Liggett Group, Inc., 505 U.S. 504, 516 (1992)).  "Thus, field preemption occurs when Congress indicates in some manner an intent to occupy a given field to the exclusion of state law."  Id.

### 3.   FAA Preemption

With respect to the FAA, Virgin argues that both types of implied preemption are present.  ECF No. 97 at 26–28.  First, Virgin argues that "[t]he FAA occupies the field with respect to setting rest and duty periods for [flight attendants], and California's meal period and rest break laws are therefore preempted."  Id.  Second, Virgin argues that California law conflicts with the FAA's requirements regarding meal and rest breaks.  ECF No. 97 at 28.

### a.   Field Preemption

"The first step" in the field preemption inquiry "is to delineate the pertinent regulatory field."  Nat'l Fed'n of the Blind v. United Airlines Inc., 813 F.3d 718, 734 (9th Cir. 2016).  Virgin argues that flight attendant break requirements occupy the field of "aviation safety," whereas Plaintiffs define the pertinent field as "the field of airline employment."  ECF No. 97 at 26–28; ECF No. 102 at 30.  The Ninth Circuit has emphasized the need to define the relevant field "with specificity."  Nat'l Fed'n of the Blind, 813 F.3d at 734.  For example, where plaintiffs challenged the airline's policy of using automatic kiosks that were inaccessible to blind travelers, "the pertinent field for purposes of field preemption analysis [was] not 'air carrier accessibility' in general," but rather "airport kiosk accessibility for the blind."  Id. at 737.  And, in a personal injury suit challenging the safety of airstairs, the relevant field was not "plane design" generally,

but rather the regulation of airstairs in particular.  <u>Martin ex rel. Heckman v. Midwest Exp. Holdings, Inc.</u>, 555 F.3d 806, 811–12 (9th Cir. 2009).  Although the Ninth Circuit has previously held that Congress intended to occupy "the field of aviation safety," <u>Montalvo</u>, 508 F.3d at 470, it has subsequently cautioned that "<u>Montalvo</u> should not be read . . . expansively with regard to the relevant field for preemption purposes." <u>Nat'l Fed'n of the Blind</u>, 813 F.3d at 734, n. 13 (internal quotation marks omitted) (quoting <u>Gilstrap v. United Air Lines, Inc.</u>, 709 F.3d 995, 1004 (9th Cir. 2013)).  The Court therefore defines the relevant field for preemption purposes as the regulation of meal and rest breaks for flight attendants.

With this definition in mind, the Court now turns to the second step of the field preemption analysis: "to survey the scope of the federal regulation within that field" and determine "whether the density and detail of federal regulation merits the inference that any state regulation within the same field will necessarily interfere with the federal regulatory scheme." <u>Nat'l Fed'n of the Blind</u>, 813 F.3d at 734.  Virgin points to four FAA regulations that it argues affect the provision of meal and rest breaks to flight attendants in some way.[11]  ECF No. 107 at 7.  Of these, the Court can identify only one that actually regulates the provision of breaks to flight attendants.[12]  <u>See</u> 14 C.F.R. § 121.467(b) (prohibiting flight attendants from working duty periods of longer than fourteen hours and requiring a nine-hour rest period between duty periods).  This lone regulation can hardly be described as comprehensive, detailed, or pervasive enough to justify federal preemption of the field.  <u>See Martin ex rel. Heckman v. Midwest Exp. Holdings, Inc.</u>, 555 F.3d 806, 812 (9th Cir. 2009) (finding that a single FAA regulation regarding airstairs was not enough to preempt state law claims that the stairs are defective).  Therefore, the FAA does not preempt the provision of meal and rest breaks to flight attendants.

---

[11] Virgin also relies heavily on the FAA's statements about its flight attendant break regulation to argue that break requirements affect airline "safety," at least to some degree, and are therefore preempted.  ECF No. 97 at 27 (citing 59 FR 42974-01).  In doing so, Virgin adopts the overly broad reading of <u>Montalvo</u> that the Ninth Circuit has repeatedly counseled against.  <u>Nat'l Fed'n of the Blind</u>, 813 F.3d at 734, n. 13 (internal quotation marks omitted) (quoting <u>Gilstrap</u>, 709 F.3d at 1004).  The Court therefore rejects this argument.

[12] The other FAA regulations outline the requisite number of flight attendants and the requirements regarding where flight attendants should be located during takeoff, landing, taxi, and stops where passengers remain on board.  <u>See</u> 14 CFR §§ 121.391, 121.393, 121.394.

United States District Court
Northern District of California

### b.      Conflict Preemption

"Conflict preemption applies 'where compliance with both federal and state regulations is a physical impossibility,' and in 'those instances where the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Ventress v. Japan Airlines, 747 F.3d 716, 720–21 (9th Cir.), cert. denied, 135 S. Ct. 164 (2014) (internal citations and quotation marks omitted).

Virgin argues that there are two potential conflicts between FAA regulations and California's meal and rest break requirements.  First, it argues that California law, which requires that employees are relieved of all duty during a thirty-minute meal break every five hours, conflicts with FAA regulations that "do not permit Plaintiffs to forego their responsibilities while in flight."  ECF No. 97 at 27–28.  Second, Virgin argues that "the FAA permits [flight attendants] to remain on duty for up to 14 hours straight before receiving a rest period," whereas California law requires a ten-minute rest-period every four hours and an additional thirty-minute meal period every five hours.  ECF No. 107 at 7.

It is not "a physical impossibility" for Virgin to simultaneously comply with California law and FAA regulations.  For example, Virgin could staff longer flights with additional flight attendants in order to allow for duty-free breaks.  In addition, the FAA regulation that Virgin relies on is wholly consistent with California's break requirements because it merely establishes the maximum duty period time and minimum rest requirements.  See 14 C.F.R. § 121.467.  Therefore, there is no conflict preemption.

### 4.      ADA Preemption

Next, Virgin argues that the application of California's Labor Code is preempted by the Airline Deregulation Act ("ADA").  ECF No. 97 at 28–29.

To support its argument, Virgin relies on the following express preemption provision in the ADA: "[A] State . . . may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier that may provide air transportation under this subpart."  49 U.S.C. § 41713(b)(1).  Based on this provision, Virgin argues that providing its flight attendants with breaks as required under California law could

United States District Court
Northern District of California

United States District Court
Northern District of California

1  "prevent the aircraft from being prepared for takeoff or passengers being boarded on time,"

2  thereby having the effect of "regulating Virgin's services and routes."  ECF No. 97 at 28–29.

3  Virgin cites to several district court cases that support its argument that meal and rest break claims

4  impact an airline's services and routes and are therefore preempted by the ADA.  See id.

5       However, all of the cases that Virgin relies on predate the Ninth Circuit's decision in Dilts

6  v. Penske Logistics, LLC, in which it squarely rejected the preemption argument that Virgin

7  makes here.  769 F.3d 637 (9th Cir. 2014), cert. denied, 135 S. Ct. 2049 (2015).  In that case, the

8  Ninth Circuit decided to "draw a line between laws that are *significantly* 'related to' rates, routes,

9  or services, even indirectly, and thus are preempted, and those that have 'only a tenuous, remote,

10  or peripheral' connection to rates, routes, or services, and thus are not preempted."  Id. at 643

11  (emphasis added) (quoting Rowe v. N.H. Motor Transp. Ass'n, 552 U.S. 364, 371 (2008)).  The

12  Court explained that this limiting principle was necessary because the phrase "related to" was so

13  broad that it could conceivably be interpreted to encompass every state law, even those that

14  Congress did not intend to preempt.  Id. ("[E]verything is related to everything else.") (quoting

15  Dillingham Constr., 519 U.S. at 335 (Scalia, J., concurring)).  With this guiding principle in mind,

16  the court held that "California's meal and rest break laws plainly are not the sorts of laws 'related

17  to' prices, routes, or services that Congress intended to preempt," adding that it was not even a

18  "close case[]."  Id. at 647.  The court went on to specifically reject the argument that Virgin makes

19  here—i.e., that providing duty-free breaks to its employees would affect service and routes—

20  explaining that the defendants "simply must hire a sufficient number of drivers and stagger their

21  breaks for any long period in which continuous service is necessary."  Id. at 648.

22       Virgin tries to distinguish Dilts by arguing that it "dealt with neither ADA preemption nor

23  the airline industry," but neither of those considerations changes this Court's analysis.  ECF No.

24  97 at 29, n. 30; ECF No. 107 at 8, n. 7.  Although Dilts involved preemption under the Federal

25  Aviation Administration Authorization Act ("FAAAA"), and not the ADA, "the FAAAA was

26  modeled on the Airline Deregulation Act of 1978" and "us[es] text nearly identical to the Airline

27  Deregulation Act's," including the exact preemption language at issue in this case.  Dilts, 769 F.3d

28  at 643–44; see also 49 U.S.C. § 14501(c) ("[A] State . . . may not enact or enforce a law,

United States District Court
Northern District of California

1   regulation, or other provision having the force and effect of law related to a price, route, or service

2   of any motor carrier . . . ").  Therefore, the <u>Dilts</u> court relied extensively on cases that involved

3   ADA preemption, noting that those cases were "instructive for [the court's] FAAAA analysis as

4   well."  <u>Dilts</u>, 769 F.3d at 644.  Virgin offers no persuasive argument as to why identical language

5   in a statute with an identical purpose should be interpreted differently merely because it applies to

6   a different industry.

7        Plaintiffs' meal and rest break claims are not preempted by the ADA.

8   **D.        Compliance With California Law**

9        Next, Virgin argues that its compensation policy and wage statements comply with

10   California law.  ECF No. 97 at 31-34.

11        **1.        Compensation Policy**

12        The relevant Wage Order requires that employers in the transportation industry pay

13   minimum wages "for all hours worked."  Cal. Code Regs. tit. 8, § 11090, Wage Order 9-2001 ¶

14   4(A).  "Hours worked" means "the time during which an employee is subject to the control of an

15   employer, and includes all the time the employee is suffered or permitted to work, whether or not

16   required to do so."  <u>Id.</u>, § 2(G).  California courts have held that "[t]his language expresses the

17   intent to ensure that employees be compensated at the minimum wage for each hour worked" and,

18   therefore, employers may not average the total amount earned by an employee over all hours

19   worked in order to comply with minimum wage laws.  <u>Armenta v. Osmose, Inc.</u>, 135 Cal. App.

20   4th 314, 323 (2005); <u>Vaquero v. Ashley Furniture Indus., Inc.</u>, 824 F.3d 1150, 1154 (9th Cir.

21   2016).[13]

22        The wage order does not require, however, that employers necessarily compensate their

23   employees through an hourly wage.  Instead, it gives employers some flexibility in this regard,

24   allowing them to calculate compensation "by time, piece, commission, or otherwise."  Cal. Code

25   _____

26   [13] Despite this clear prohibition against averaging to meet minimum wage requirements, Virgin
    argues that "there is no evidence that when applying the number of credits received for each Duty
27   Period against their hours worked for the Duty Period that Plaintiffs received below the minimum
    wage."  ECF No. 97 at 33.  As explained above, that is not the relevant question under California
28   law; the relevant question is whether the Plaintiffs were paid the minimum wage for each hour
    worked.

27

United States District Court
Northern District of California

Regs. tit. 8, § 11090, Wage Order 9-2001 ¶ 4(B); see also id, § 2(O) ("'Wages' includes all amounts for labor performed by employees of every description, whether the amount is fixed or ascertained by the standard of time, task, piece, commission basis, or other method of calculation.").  Therefore, the fact that Virgin does not pay its flight attendants on a straight hourly basis for all activities, but rather through a "credit-based system" that pays a fixed rate for certain activities, does not violate California law in and of itself.

However, Virgin must still compensate its employees for all time worked *in some way*, irrespective of how it calculates that compensation (e.g. based on hours worked, the particular task performed, or some other factor).  See, e.g., Cardenas v. McLane FoodServices, Inc., 796 F. Supp. 2d 1246, 1249-53 (C.D. Cal. 2011) (holding that the employer's piece-rate pay formula for its truck drivers—which was based on miles driven, stops made, and products delivered—violated California's minimum wage law because the compensation formula "did not separately compensate employees for pre- and post-shift time not calculated for in the piece-rate plan").  If an employer's compensation system fails to account for all work duties in this way, it violates California's minimum wage law and the employer cannot make up the difference by relying on impermissible averaging.  See id.

### a.        Compensation for Non-Block Duty Time

The Plaintiffs claim that Virgin has no identifiable means of paying for duty hours outside of block time—i.e., time spent before takeoff and after arrival.  ECF No. 102 at 21-22.  Plaintiffs argue that they are subject to Virgin's control and perform work during this non-block duty time, including participating in pre-flight briefings and boarding passengers, so they must be paid for that time.

Virgin responds that it compensates flight attendants for non-block duty time, relying largely on the following provision in its Work Rules: "[t]he credit value *for each duty period* within a pairing will consist of block hours, deadhead or ground transportation credit, and minimum duty credit..."  ECF No. 97 at 31 (emphasis in original); see also ECF No. 45-4 at 12.  Virgin appears to be arguing that, because its Work Rules *say* that flight attendants will be compensated "for each duty period," Virgin actually did compensate flight attendants for the entire

28

duty period, including non-block time.  But, as the court explained in <u>Cardenas</u>, "it is irrelevant whether the pay formula was *intended* to compensate pre- and post-trip duties, or even if employees believed it covered those duties, if its formula did not actually directly compensate those pre- and post-trip duties."  <u>Cardenas</u>, 796 F. Supp. 2d at 1253 (emphasis in original).  The Court must therefore look to Virgin's compensation formula to determine whether it "separately compensate[s]" for non-block duty hours.  <u>Id</u>.

It does not.  The formula, as articulated in Virgin's work rules, always compensates flight attendants for block time and time spent deadheading.  <u>See</u> ECF No. 45-4 at 12-13.  However, it does not separately compensate non-block, non-deadheading duty time, which includes time when flight attendants are performing work (e.g. boarding and deplaning passengers) and subject to Virgin's control.  One could argue that the "minimum duty period credit" presumably compensates for all time spent on duty, including non-block duty hours, but even that compensation is not guaranteed.  <u>See id</u>.  Rather, a flight attendant is only entitled to the "minimum duty period credit" for a given day if he or she has not already earned 3.5 hours of block time or deadheading credit for the day.  <u>Id</u>.  In addition, the Crew Pay Manual explicitly states that "crewmembers are not paid for time 'on the clock' (duty time); instead, they are typically paid only when the aircraft is moving (block time)."  ECF No. 100-9 at 8.  This further suggests that non-block duty time goes uncompensated.  <u>Ridgeway v. Wal-Mart Stores, Inc.</u>, 107 F. Supp. 3d 1044, 1052 (N.D. Cal. 2015), <u>motion to certify appeal denied,</u> No. 08-CV-05221-SI, 2015 WL 4463923 (N.D. Cal. July 21, 2015) (granting summary judgment on plaintiff's minimum wage claim because "certain required tasks are specifically designated as unpaid activities" under the employer's piece-rate compensation system).  Because Virgin's formula does not separately compensate flight attendants for duty time that is not block time or deadheading time, the Court denies Virgin's motion for summary judgment that its compensation system for flight activities complies with California law.

The cases from this district that Virgin relies on are distinguishable.  ECF No. 97 at 31-32.  For example, the compensation formula at issue in <u>Oman</u> included a guaranteed "duty period credit" of one hour of pay for every two hours of duty, in addition to a "minimum duty credit" of

approximately five hours.  See Oman v. Delta Air Lines, Inc., 153 F. Supp. 3d 1094, 1098-99 (N.D. Cal. 2015).  This duty period credit appeared to factor prominently in the Oman court's conclusion that "Delta's Work Rules ensure that Flight Attendants are paid for all hours worked." Id. at 1105-06.  For instance, the court began its analysis by citing to another case in which a court relied on Delta's duty period credit to conclude that "Flight Attendants will be paid, at a minimum, at the rate of one half of their flight pay for each hour that they spend working on duty for defendant."  Id. at 1102-03 (quoting DeSaint v. Delta Air lines, Inc., No. CIV.A. 13–11856–GAO, 2015 WL 1888242 (D.Mass. Apr. 15, 2015)).  The Booher court similarly dealt with compensation formulas that included a guaranteed duty period credit and concluded that "Plaintiffs are paid for all hours worked, based on the minimum guarantee in the Bid Packet and considering all hours actually worked."  Booher v. JetBlue Airways Corp., No. C 15-01203 JSW, 2016 WL 1642929, at *3 (N.D. Cal. Apr. 26, 2016).

Unlike the compensation formulas at issue in the cases above, which ensured that flight attendants were, "at a minimum," compensated for all hours on duty, Virgin's formula does not provide such a guarantee.  As explained above, Virgin's flight attendants only receive credit for duty hours if they have not already earned 3.5 credits of block time or deadheading time for the day.  Virgin therefore fails to compensate its flight attendants for all hours worked.

### b.      Compensation for Non-Flight Activities

The Plaintiffs also claim that Virgin fails to pay for all hours worked doing certain non-flight activities, such as time spent undergoing mandatory drug testing, attending mandatory training, deadheading, completing incident reports, and being on reserve duty.  ECF No. 32 ¶ 46.

With the single exception of time spent completing incident reports, Virgin's compensation formula accounts for all of the above non-flight work duties when calculating compensation.  ECF No. 45-4 at 12-13.  Specifically, it assigns thirty minutes of credit for drug testing, a flat monthly rate for initial flight attendant training, 3.5 hours of credit for annual training, and four hours of credit for airport reserve shifts in which flight attendants are not assigned to a flight.  ECF No. 47-5 at 7, 9; ECF No. 45-4 at 16, 24.  Because Virgin's formula directly compensates Plaintiffs for these non-flight work duties, albeit via a credit-based system

1   instead of an hourly rate, Plaintiffs cannot succeed on their claims related to non-payment for

2   these tasks. <u>Oman</u>, 153 F. Supp. 1098-99 (upholding a credit-based system that allotted one hour

3   of pay for every two hours of duty).  The Court therefore grants Virgin's motion for summary

4   judgment as to claims based on those activities.

5          However, Virgin's compensation formula completely fails to account for time spent

6   completing incident reports, and the Plaintiffs have presented evidence that they were unable to

7   complete these mandatory incident reports during block time.  ECF No. 101-29 at 10.  The Court

8   therefore denies Virgin's motion for summary judgment as to claims based on the completion of

9   incident reports.

10                  **2.        Wage Statements**

11         Under § 226 of the California Labor Code, an employer is required to provide "an accurate

12  itemized wage statement" showing gross wages, total hours worked, net wages earned, and all

13  applicable hourly rates in effect during the pay period and the corresponding number of hours

14  worked at each hourly rate, among other things.  Cal. Lab. Code § 226(a).  "The employer's

15  violation of section 226 must be 'knowing and intentional.'"  <u>Garnett v. ADT LLC</u>, 139 F. Supp.

16  3d 1121, 1133 (E.D. Cal. 2015), <u>reconsideration denied,</u> No. 2:14-02851 WBS AC, 2016 WL

17  146232 (E.D. Cal. Jan. 13, 2016) (quoting Cal. Labor Code § 226(e)(1)).

18         Virgin concedes that its wage statements do not show the effective hourly rate of pay for

19  each hour on duty, but it claims that its compensation system prevents full compliance and that it

20  nonetheless is "complying with Section 226 in good faith."  ECF No. 97 at 34.  Virgin also admits

21  that, pursuant to its payment policies, its month end wage statement does not show the actual

22  number of hours worked during that pay period, but rather just shows 37.5 hours at the flight

23  attendant's base rate by default.  ECF No. 101-30 at 10.

24         Good faith is not a defense to a wage statement violation under § 226.  <u>Garnett</u>, 139 F.

25  Supp. 3d at 1133-34.  Moreover, the fact that Virgin's wage statement deficiencies are part of a

26  centralized policy that fails to comply with § 226 suggests that the violation is knowing and

27  intentional.  <u>Id</u>.

28         The Court therefore denies Virgin's motion for summary judgment on the Plaintiffs' wage

United States District Court
Northern District of California

1    statement claims.

2        **E.    Plaintiffs' Overtime and Break Eligibility**

3        Next, Virgin argues that, because the California Labor Code does not apply

4    extraterritorially, the Plaintiffs must show that they worked the requisite number of hours within

5    California to trigger overtime and break requirements.  ECF No. 97 at 29.  Virgin argues that the

6    Plaintiffs cannot do so because time spent flying in the airspace above California is not time spent

7    within California.  Id.

8        The Court rejects Virgin's argument that California wage and hour law cannot apply to

9    flight attendants while they are in the air.  To support its argument, Virgin cites to a provision of

10   the FAA (§ 40103), but the Court has already rejected Virgin's argument for FAA preemption.

11   Although the federal government has exclusive sovereignty over the United States airspace and

12   aviation safety, "Congress has not occupied the field of employment law in the aviation context

13   and … the FAA does not confer upon the agency the exclusive power to regulate all employment

14   matters involving airmen."  Ventress v. Japan Airlines, 747 F.3d 716, 722 (9th Cir.), cert. denied,

15   135 S. Ct. 164 (2014).  And the federal employment law proposed by Virgin, the FLSA, explicitly

16   contemplates that state wage and hour laws like California's will apply concurrently with federal

17   law.  29 U.S.C. § 218.  The only conflicting authority that Virgin presents is a single footnote in a

18   single, non-controlling district court case from the Northern District of Illinois.  See Hirst v.

19   Skywest, Inc., No. 15 C 02036, 2016 WL 2986978, at *10, n. 14 (N.D. Ill. May 24, 2016).  The

20   Court does not find the case persuasive.

21       There is evidence that the Plaintiffs worked more than eight hours some days such that

22   they qualify for overtime pay.  As explained above, the Plaintiffs' overtime claims do not seek to

23   apply California law extraterritorially.  Because the alleged wrongful conduct – i.e. Virgin's

24   decisions about how to compensate its flight attendants and its payment of flight attendants in

25   accordance with those decisions – occurred in California, Virgin may be held accountable for that

26   wrongful conduct under California law regardless of where the Plaintiffs worked their shifts.  In

27   any event, there is also evidence that Plaintiffs worked shifts longer than eight hours *within*

28   *California* such that they qualify for overtime pay.  For example, Virgin's own expert testified that

United States District Court
Northern District of California

United States District Court
Northern District of California

1    each of the Plaintiffs had at least one day where they worked in excess of eight hours within

2    California.  ECF No. 101-31 at 3:9-24.  This evidence is sufficient to create a triable issue of fact

3    regarding whether the Plaintiffs were eligible for overtime pay.

4         Although Plaintiffs' break claims are geographically limited, there is sufficient evidence

5    that the Plaintiffs worked duty periods solely within California – for example, on flights between

6    California airports – that were long enough to trigger meal period and rest break eligibility.  ECF

7    No. 101-17 (showing Plaintiffs' scheduled flights between California airports).  Virgin's expert

8    found that, when time spent on California tarmacs was considered, "the data reflects few instances

9    when Plaintiffs potentially worked enough hours in California to be eligible for meal periods (days

10   longer than 5 hours) or rest breaks (days longer than or equal to 3.5 hours)."  ECF No. 98-2 at 6.

11   Specifically, Virgin's expert found fifty instances in which Plaintiff Smith was potentially eligible

12   for a rest break, four instances in which Plaintiff Bernstein was potentially eligible for a rest break,

13   and fifty-three instances in which Plaintiff Garcia was potentially eligible for a rest break.  Id.  He

14   also found thirty-one instances in which Plaintiff Smith was potentially eligible for a meal period,

15   four instances in which Plaintiff Bernstein was potentially eligible for a meal period, and twenty-

16   six instances in which Plaintiff Garcia was eligible for a meal period.  Id.  This evidence is

17   sufficient to create a triable issue of fact regarding whether Plaintiffs were eligible for breaks

18   when working in California.

19        The Court accordingly denies Virgin's motion for summary judgment on the overtime and

20   break claims.

21        **F.     Covered Employees Under the San Francisco Minimum Wage Ordinance**

22        Next, Virgin argues that the Plaintiffs are not covered employees under the San Francisco

23   Minimum Wage Ordinance ("SFMWO").  ECF No. 97 at 33.  The SFMWO states that

24   "Employers shall pay Employees no less than the Minimum Wage for each hour worked within

25   the geographic boundaries of the City."  S.F. Admin. Code § 12R.4.  "City" is defined to include

26   "the City and County of San Francisco," and an "Employee" is any person who "[i]n a particular

27   week performs at least two (2) hours of work for an Employer within the geographic boundaries of

28   the City."  Id., § 12R.3.  Although San Francisco International Airport (SFO) is owned by the City

1    and County of San Francisco, it is located outside the city limits of San Francisco and in San

2    Mateo County.  Virgin's training facility is also located outside the City and County of San

3    Francisco.  Plaintiffs fail to address this argument in their opposition.  Because the Plaintiffs have

4    failed to show that they are covered under the SFMWO, the Court grants summary to Virgin on

5    those claims.

6        **G.    Business Expenses**

7            The Plaintiffs claim that Virgin required Plaintiffs Garcia and Smith to maintain a valid

8    passport, but that Virgin did not indemnify Plaintiffs for the costs incurred in purchasing and/or

9    renewing passports.  ECF No. 32 ¶ 101.  However, Virgin argues that the Plaintiffs have not

10   produced any evidence that they incurred business expenses related to their passports and, as a

11   result, they cannot prevail on their claim for failure to indemnify for necessary expenditures.  ECF

12   No. 97 at 34-35.

13           Plaintiff Garcia testified that she obtained her passport before she began working for

14   Virgin and did not renew her passport while she was working for Virgin.  ECF No. 61-2 at 7:10-

15   15.  Plaintiff Smith similarly testified that she had a passport before she started working for Virgin

16   and her passport does not expire until 2020.  ECF No. 61-3 at 23.  Plaintiffs fail to point to any

17   countervailing evidence in their opposition.

18           The Court therefore grants Virgin's motion for summary judgment as to the Plaintiffs'

19   claim for business expenses under California Labor Code § 2802.

20       **H.    Remaining Claims**

21           Because the Court has not dismissed all of the Plaintiffs' underlying claims for unpaid

22   wages, it denies Virgin's motion for summary judgment on the derivative waiting time penalty,

23   unfair competition, and Private Attorney General Act ("PAGA") claims.

24   / / /

25   / / /

26   / / /

27   / / /

28

United States District Court
Northern District of California

1

**CONCLUSION**

2  For the reasons above, the Court denies in part and grants in part Virgin's motion for

3 summary judgment.

4   IT IS SO ORDERED.

5 Dated:  January 5, 2017

6

7                                                  _____

8                                      JON S. TIGAR
                                  United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

35