EXHIBIT L

```
 1                UNITED STATES DISTRICT COURT

 2               NORTHERN DISTRICT OF CALIFORNIA

 3

 4   JULIA BERNSTEIN, LISA MARIE
     SMITH, and ESTHER GARCIA, on
 5   behalf of themselves and all
     others similarly situated,
 6
              Plaintiffs,
 7
         vs.                              No. 15-cv-02277-JST
 8
     VIRGIN AMERICA, INC., and DOES
 9   1-10, inclusive,

10            Defendants.
     _____
11

12

13

14              VIDEOTAPED DEPOSITION OF

15                     CARL SABA

16

17              January 10, 2018

18            11:23 a.m. - 5:02 p.m.

19

20     One Market, Spear Street Tower, 28th Floor

21              San Francisco, California

22

23      GINA GLANTZ, CSR No. 9795, RPR, RMR

24

25
```



```
 1                   APPEARANCES OF COUNSEL

 2

 3    On Behalf of Plaintiffs:

 4        RONALD S. KRAVITZ, ESQ.
          SHEPHERD FINKELMAN MILLER & SHAH, LLP
 5        44 Montgomery Street, Suite 650
          San Francisco, California 94104
 6        (415) 429-5272
          rkravitz@sfmslaw.com
 7

 8    On Behalf of Defendant Virgin America, Inc.:

 9        ROBERT JON HENDRICKS, ESQ.
          MORGAN LEWIS & BOCKIUS LLP
10        One Market, Spear Street Tower
          San Francisco, California 94105-1596
11        (415) 442-1000
          rj.hendricks@morganlewis.com
12

13    Videographer:

14        LORENZO FERNANDEZ-KOPEC

15

16

17

18

19

20

21

22

23

24

25
```



Page 65
1  isn't that correct?
2      MR. KRAVITZ:  Objection.  Argumentative.
3      THE WITNESS:  Well, if -- okay.  Yes, that's
4  correct.
5  BY MR. HENDRICKS:
6   Q.  Let's turn to your report.  You say -- you give a
7  cite of footnote 2 for that particular sentence.  Do you
8  see that?
9   A.  Yes.
10  Q.  And footnote 2 references the Lee report,
11  paragraph 7, page 12.  Do you see that?
12  A.  Yes.
13  Q.  In fact, you meant to say paragraph 6 of the Lee
14  report, page 12; isn't that correct?
15  A.  Yes, I believe that's correct, because paragraph 6
16  is very long, it has multiple bullet points, and I believe
17  that that's what I was intending to reference.  Yes,
18  that's correct.
19  Q.  So on page 12, the first bullet point, you see
20  that Dr. Lee's statement is "If Virgin America could
21  hypothetically comply with California's meal and rest
22  break laws by making payments to its ITMs for the workdays
23  in which Virgin America fails to provide meal periods and
24  rest breaks, these additional ITM-related wage costs would
25  be approximately $6.5 million annually."  Do you see that?

Page 66
1   A.  Yes, I do.
2   Q.  That statement, "If Virgin America could
3  hypothetically comply" -- you understand that by that
4  statement, Dr. Lee is not saying that this would, in fact,
5  constitute compliance, he's posing a hypothetical;
6  correct?
7   A.  I understand that.
8   Q.  Okay.  And then he -- look at the next bullet
9  point on the same page.  "Likewise, if California" -- "if
10  compliance with California's wage and hour laws only" --
11  "requires Virgin America to pay ITMs more, then Virgin
12  America's ability to compete in the U.S. airline industry
13  would be significantly impaired."
14     Again -- the phrase "Likewise, if compliance with
15  California's wage laws require," again, he's posing that
16  as a hypothetical; correct?
17  A.  That's correct.
18  Q.  He's not saying that this would constitute
19  compliance; correct?
20  A.  Well, I think you're very focused on terminology.
21  I understand the intent is that he is running different
22  scenarios that may comply with the law.  You can call them
23  hypotheticals.  For me, it's the same thing.
24  Q.  Dr. Lee, in his report, makes no statement
25  whatsoever whether or not the hypotheticals that he

Page 67
1  analyzes, in fact, constitute compliance or not; correct?
2   A.  Well, I don't know why he would be running those
3  hypotheticals if they couldn't -- if they didn't
4  potentially comply with the law, because that's what he's
5  addressing in his report.
6   Q.  I'm not asking you why.  I'm asking what he says.
7  There's nowhere in his report that he says "these
8  particular scenarios, in fact, would constitute compliance
9  with California law"; correct?
10  A.  That's correct.
11  Q.  In fact, are you aware that these scenarios are
12  predicated upon assertions that the plaintiffs have made
13  in this case, that the plaintiffs have made these
14  contentions in this case that that would constitute
15  compliance, not Virgin?
16     MR. KRAVITZ:  Objection.  Overbroad.
17  BY MR. HENDRICKS:
18  Q.  Are you aware of that?
19     MR. KRAVITZ:  Objection.  Overbroad, lack of
20  foundation.
21     Go ahead.
22     THE WITNESS:  I am now.  I was not aware of that.
23  BY MR. HENDRICKS:
24  Q.  Okay.  And going to the same paragraph, paragraph
25  6, page 10, the first bullet point, first full bullet

Page 68
1  point, "To the extent that Virgin America would be
2  required to relieve flight attendants of all duties within
3  specified times in order to comply with California's meal
4  period and rest break laws and simultaneously comply with
5  applicable FAA regulations, Virgin America's route network
6  would significantly be reduced, eliminating the majority
7  of interstate routes it currently serves, which --in
8  turn--...most probably force the Company to terminate all
9  services."  Do you see that sentence I just read?
10  A.  I do.
11  Q.  Again, the first portion of that sentence is
12  conditional, "To the extent that Virgin America would be
13  required."  You understand it's conditional; right?
14     MR. KRAVITZ:  Objection.  The document speaks for
15  itself.
16     THE WITNESS:  I understand that it is.
17  BY MR. HENDRICKS:
18  Q.  Based upon your reading, you understand that it's
19  conditional; correct?
20  A.  I do.
21     MR. KRAVITZ:  Same objection.
22  BY MR. HENDRICKS:
23  Q.  So to the extent -- you would agree with me that
24  to the extent anything in your report is suggesting that
25  Dr. Lee reached conclusions that the scenarios he analyzes



Page 69

1  in his report, in fact, would constitute compliance, those
2  statements in your report would be inaccurate; correct?
3     A.  That's correct.  And that is not the intent of my
4  report.
5     Q.  Fair enough.  So we've clarified here.
6     A.  We have.
7     Q.  And you've not reached any conclusions or rendered
8  any opinions that the scenarios analyzed by Dr. Lee, in
9  fact, would constitute compliance under California law;
10  correct?
11     A.  That's correct.
12     Q.  Okay.  And you've not analyzed or made any
13  opinions with respect to what affirmatively would
14  constitute compliance with California law; correct?
15     A.  That's correct.
16     Q.  Okay.  Take a look at page 13 of Dr. Lee's report.
17        MR. KRAVITZ:  You want some more water?
18        THE WITNESS:  I'm okay.
19  BY MR. HENDRICKS:
20     Q.  The first bullet point at the top, the one that
21  continued from the prior page, the last sentence says,
22  "Thus forcing Virgin America to comply with Plaintiffs'
23  interpretation of California's wage laws would be
24  detrimental to consumers outside California who would
25  otherwise fly Virgin America to California as well as

Page 70

1  consumers inside California who would otherwise fly Virgin
2  America to destinations outside of California."  Do you
3  see that statement?
4     A.  I do.
5     Q.  Okay.  Here, Dr. Lee is making clear that what
6  he's referring to are plaintiffs' interpretation of
7  compliance with California wage and hour laws; correct?
8     A.  I do see that, yes.
9     Q.  Okay.  I want to ask you some questions regarding
10  paragraph 8, now, of your declaration.  It says here, "The
11  Lee Report does not follow its analysis to determine the
12  magnitude of additional costs on Virgin America's
13  profitability.  The Lee Report does not determine to what
14  extent Virgin would reduce travel routes, or to what
15  extent demand would decline from consumers due to
16  increased cost of compliance.  Finally, the Lee Report
17  does not consider certain avenues of compliance that would
18  be less costly than the scenarios contained in the Lee
19  Report."  Do you see this statement by you?
20     A.  I do.
21     Q.  Okay.  So my first question is, is did you conduct
22  any analysis using the information contained in the Lee
23  report to determine the magnitude of additional cost on
24  Virgin America's profitability?
25     A.  I did at a high level.

Page 71

1     Q.  When you say "a high level," what do you mean by
2  that?
3     A.  I mean that I've reviewed the costs that Dr. Lee
4  estimates in his various scenarios, and compared them to
5  the reported profitability and generally financial
6  performance of Virgin America.
7     Q.  Anything else?
8     A.  I've compared Virgin America to a peer group of
9  other airlines, including Alaska Air, into which it was
10  merged.
11     Q.  Anything else?
12     A.  No.
13     Q.  Okay.  So you basically looked at the calculations
14  that Dr. Lee did and then compared it to your conclusions
15  of profitability based upon the financial statements
16  contained in Exhibit 3 to make a determination as to
17  whether or not there would still be some level of
18  profitability; is that right?
19     A.  Yes, and I was, in a broader context, also
20  considering the trend over time.
21     Q.  Okay.  In what period of time did you look at the
22  trend for?
23     A.  2006 through 2016, although for Virgin, there is
24  no data prior to 2009.
25     Q.  Okay.  You say here, "The Lee Report does not

Page 72

1  determine to what extent Virgin would reduce travel
2  routes."  Did you conduct any analysis as to the extent
3  that travel routes would be reduced if California wage and
4  hour law applied?
5     A.  I did not.
6     Q.  Why not?
7     A.  Because my scope of work was limited to assessing
8  Dr. Lee's analysis, and whether his analysis supports his
9  conclusions.
10     Q.  You also say here that Dr. Lee does not determine
11  "to what extent demand would decline from consumers due to
12  increased costs of compliance."  Did you conduct that
13  analysis?
14     A.  I did not.
15     Q.  Why not?
16     A.  It's the same answer.  My scope of work was
17  limited to reviewing Dr. Lee's report and his analysis and
18  whether his analysis supports his conclusions.
19     Q.  Okay.  So this is my question for you.  You also
20  indicate here, "Finally, the Lee Report does not consider
21  certain avenues to compliance that would be less costly
22  than the scenarios contained in the Lee Report."
23        So my question as to that sentence is this:  In
24  your report, you do consider other avenues of compliance;
25  is that correct?



Page 73

1  A.  I don't develop the scenarios but I am aware that
2  there may be other avenues to compliance.
3  Q.  And let's go to paragraph 19 of your declaration.
4      One example that you indicate here is -- strike
5  that.
6      Paragraph 19 reads, "In addition to Virgin's
7  ability to absorb the Lee Report's high end of range of
8  compliance costs, the Lee Report does not quantify
9  alternative paths to compliance.  For example, one less
10 costly alternative may be for Virgin America to
11 selectively reduce flight frequency."  Do you see that?
12 A.  Yes.
13 Q.  That's one affirmative suggestion in your report
14 that you're providing as an alternative to the scenarios
15 that were considered by Dr. Lee; correct?
16 A.  Correct.
17 Q.  Okay.
18 A.  And --
19 Q.  So with respect to that scenario -- first of
20 which, how did you come up with that scenario?  Was that
21 something you came up with yourself or were you provided
22 that scenario by someone else?
23 A.  I was about to say, Dr. Lee actually discusses the
24 impact of potential compliance on the ability of Virgin
25 America to provide the same frequency of flights.  But I

Page 74

1  don't then see the analysis carried through to actually
2  quantify what that might mean in financial terms to Virgin
3  America.
4      MR. HENDRICKS:  Move to strike as nonresponsive.
5  Q.  My question is this.  You say here, "For example,
6  one less costly alternative may be for Virgin America to
7  selectively reduce flight frequency."  Where did you get
8  that statement from?  Is that an opinion that you came up
9  with or did someone direct you to that conclusion?
10 A.  That statement came from mention in Dr. Lee's
11 report, as I just stated in my prior response, as well as
12 my own opinion.  If I were preparing this type of
13 analysis, it would be one of the things I would consider.
14 Q.  Okay.  So first things first.  Can you point to me
15 where, in Dr. Lee's report, he says "one less costly
16 alternative may be for Virgin America to selectively
17 reduce flight frequency"?
18 A.  He doesn't state it that way.  He just talks about
19 the impact of potential compliance on the ability of the
20 carrier to continue providing the same flight frequency.
21 Q.  So your opinion here is that one thing that -- so
22 strike that.
23     He doesn't affirmatively make this statement;
24 that's an inference that you're reaching; correct?
25 A.  Correct.

Page 75

1  Q.  And you testified that based on your own sort of
2  how you would go about conducting these analyses, this is
3  a conclusion that you reached as one potential
4  alternative; correct?
5  A.  Yes, my point is, if he is stating in his report
6  that potential compliance would impact the carrier's
7  ability to provide the same frequency of flights, my next
8  question then becomes, okay, how -- what is the impact of
9  frequency, how many fewer flights, which flights, what
10 would it do to Virgin America's cost structure, et cetera,
11 that is what I'm getting at here.
12 Q.  Sir, let me be clear here.  You go more than that.
13 You don't simply say -- you already say that the Lee
14 report does not quantify alternative past compliance; you
15 already say that; right?
16 A.  Correct.
17 Q.  You say something further than he doesn't quantify
18 it.  You affirmatively say "one less costly alternative
19 may be for Virgin America to selectively reduce flight
20 frequency."  That's an affirmative statement by you;
21 correct?
22 A.  Yes, I say it could be a less costly alternative.
23 Q.  So let me ask you this question.  How do you know
24 that it could be less costly?  Did you do an analysis?
25 A.  No.

Page 76

1  Q.  So right now, you don't know that, in fact, it
2  would be less costly?
3  A.  I don't know that.
4  Q.  Okay.  But to the extent you're correct, then your
5  opinion is is that one effect of compliance with
6  California law would be that a carrier such as Virgin
7  might reduce the number of flights that it's having from
8  L.A. to San Francisco if that was somehow too costly for
9  them; correct?
10 A.  I think it's an option that they would consider.
11 Q.  And, in theory, they could -- if, in looking at a
12 particular route, it was determined that that route was
13 too expensive, they could just stop that particular trip
14 entirely?  If it was too -- if compliance was too
15 expensive, one alternative would be to just stop the route
16 completely; correct?
17 A.  Yes, but I think there are multiple considerations
18 that are involved in that.  I think it would depend on how
19 it impacts other routes.  It would depend on how it
20 impacts staffing within the airline.  I mean, I think all
21 of those factors would have to be considered.
22 Q.  So you're saying that staffing relates to routes?
23 A.  I am saying that there are multiple considerations
24 that the airline would have to undertake in order to
25 decide whether to discontinue a particular flight or not,



Page 93

1  the FAA was -- considered to have in-flight breaks and
2  rejected it, and instead implemented a structure where a
3  flight attendant had one continuous duty period followed
4  by one continuous period of rest that was uninterrupted.
5  Under that scenario -- you're not a regulatory expert, I
6  withdraw the hypothetical.
7       The point being is that to the extent that
8  Dr. Lee's assumptions are determined to be correct, your
9  report does not issue any opinions criticizing the
10 conclusions that he reaches from those assumptions;
11 correct?
12      MR. KRAVITZ:  Objection.  Vague, ambiguous and
13 overbroad.
14      THE WITNESS:  Correct.  Again with the
15 clarification that we are talking about this issue of an
16 eight-hour -- eight-consecutive-hour break under FAA
17 regulations.
18 BY MR. HENDRICKS:
19   Q.  Right.  And you understand that what that issue is
20 addressing is this notion.  Do you understand that
21 plaintiffs in this case have suggested that a flight
22 attendant could be on an airplane, reach the trigger point
23 under California law for a break, let's say a rest break,
24 take a ten-minute break, go off duty, have it completely
25 be duty-free, uninterruptible, and then, ten minutes

Page 94

1  later, come back on on duty and still be in compliance
2  with federal regulations?  Do you understand that that's
3  their version of compliance?
4       MR. KRAVITZ:  Objection.  Lack of foundation.
5  BY MR. HENDRICKS:
6    Q.  Maybe you do, maybe you don't.
7       MR. KRAVITZ:  Outside the scope.
8       THE WITNESS:  I understand that counsel's
9  interpretation of the regulations is that you would not
10 need to take an eight-hour uninterrupted break at every
11 rest break period.
12 BY MR. HENDRICKS:
13   Q.  Did counsel indicate to you whether and to what
14 extent you would need -- the length of the break would
15 need to be?
16   A.  We may have discussed it.  It may be the ten
17 minutes that you're referring to, I don't explicitly
18 recall.
19   Q.  Okay.  Do you understand that plaintiffs'
20 version -- plaintiffs' theory in this case is the notion
21 that a flight attendant can be in the air, and if
22 California law applies, they are entitled to a meal break
23 at a certain specified time, and that during that meal
24 break period, if there was some emergency or some activity
25 that required -- otherwise required their attention, that

Page 95

1  they would be legally entitled to ignore that emergency
2  event and continue with their break; do you understand
3  that?
4       MR. KRAVITZ:  Objection.  Outside the scope of the
5  expert's testimony here.
6       THE WITNESS:  I haven't had that explicit scenario
7  in discussion with counsel, so I don't understand that.
8  BY MR. HENDRICKS:
9    Q.  Okay.  Fair enough.
10      So I'm confused then.  What -- so what is -- when
11 you say "I've been asked by plaintiffs' counsel to assume
12 a reasonable legal interpretation of compliance with
13 California law, and FAA regulations would not result in
14 every break requiring at least eight consecutive hours off
15 duty," by that statement, do you have an understanding
16 that some breaks might require at least eight hours of
17 consecutive rest off duty?
18   A.  Possibly.  I just -- this was specifically in
19 reference to the scenarios that Dr. Lee had in his report,
20 that assumed that every break would be eight hours, that
21 there was this interplay with FAA regulations and
22 California law that would cause that to occur, and, you
23 know, my opinion is not sort of beyond that.  It's that
24 I'm being asked to assume that that's not a reasonable
25 legal interpretation, and therefore that those scenarios

Page 96

1  would not come to bear.
2    Q.  Were you provided any information with respect to
3  why that's not reasonable or just the conclusion, we want
4  you to assume that it's not reasonable?
5    A.  Well, I think we had a discussion about it.  I
6  don't think it was a very detailed discussion.  I think
7  for purposes of my report, I would say I was asked to
8  assume that that's how the law should be interpreted.
9    Q.  Okay.  So continuing to page 10, I think we may
10 have discussed this, but I just want to walk through it
11 again.  Paragraph 10.a., you now acknowledge that the
12 scenario relating to adding one ITM to every flight,
13 resulting in an increase from three to four ITMs, was a
14 scenario that Dr. Lee was asked to assume and to consider,
15 not one for which he concluded constitute a compliance;
16 correct?
17   A.  That's correct.
18   Q.  And the same thing is true with respect to paying
19 additional compensation to ITMs in lieu of meal periods or
20 rest breaks, you understand that that was a scenario that
21 Dr. Lee was asked to consider and that he's not rendering
22 some opinion as to whether or not that would be
23 compliance; correct?
24   A.  Correct.
25   Q.  And the last item, c., paying ITMs for all



CARL SABA  
JULIA BERNSTEIN vs VIRGIN AMERICA, INC  
January 10, 2018  
97–100

Page 97

1  nonblock hours worked, you understand that's a scenario he
2  was being asked to consider, not one that he was
3  affirmatively opining constitutes compliance; correct?
4     A.  Correct.
5     Q.  Let me go to number -- well, no, we won't go
6  there.
7         Taking a look at footnote 7, you say here, "I note
8  that certain of the examples in the Lee Report relate to
9  A319 aircraft, even though the vast majority of Virgin
10 America's fleet are composed of A320 aircraft."  Do you
11 see that?
12    A.  Yes.
13    Q.  First of which, did you conduct any sort of
14 analysis in your report that reanalyzed the scenarios
15 provided by Dr. Lee but using examples involving A320
16 aircraft?
17    A.  No, I did not.
18    Q.  Did you ask plaintiffs' counsel to provide you
19 with any data with respect to the A320 aircraft and its
20 use in attempting to form your opinions in this case?
21    A.  No, I did not.
22    Q.  Do you know whether or not had any different
23 example been used, that is to say, if Dr. Lee had used
24 more examples involving A320 aircraft, whether that would
25 have resulted in any change of conclusion or opinion?

Page 98

1     A.  I don't know if it would have or not.
2     Q.  So you don't know whether this observation that
3  you make, that he uses an example from A319 aircraft as
4  opposed to A320 aircraft, you really don't know whether
5  that would result in a material difference in either his
6  analysis or yours; correct?
7     A.  I don't, that's correct.
8     Q.  Now, did you physically write this report?
9     A.  I did.
10    Q.  Okay.  And coming back to this question here,
11 paragraph 13, you say, "The Lee Report does not quantify
12 or analyze the impact of Virgin America being required to
13 comply with California Wage and Hour Laws with respect to
14 meal...breaks only for intra-California work/flights, even
15 though I've been advised by Plaintiffs' counsel that these
16 claims have been so limited by the Court."  Do you see
17 that statement?
18    A.  Yes.
19    Q.  Okay.  That statement is inaccurate, isn't it?
20        MR. KRAVITZ:  Objection.  Lack of foundation,
21 assumes facts not in evidence.
22        THE WITNESS:  In what way is it inaccurate?
23 BY MR. HENDRICKS:
24    Q.  Isn't it true that, in fact, the Lee report does
25 analyze the impact of Virgin America being required to

Page 99

1  comply with California wage and hour laws with respect to
2  meal and rest breaks for only intra-California flights, at
3  least in some parts?
4     A.  I think in some parts, there are some scenarios
5  that speak of intra-California flights.  I believe those
6  are the scenarios that also assume the eight-hour
7  FAA-mandated rest break.  I'm going off of memory at the
8  moment, but what I'm talking about is specifically these
9  cost increases that Dr. Lee is speaking of.  It's my
10 understanding that those are based on, for example,
11 assuming one more ITM or flight attendant would be added
12 to each flight, to go from three to four, resulting in a
13 33 percent increase in cost.  It is my understanding that
14 Dr. Lee is not limiting that to intra-California flights.
15 And Dr. Lee's report states that intra-California flights
16 comprise, I believe, 7.7 percent of total flights for
17 Virgin America.
18    Q.  Okay.  So I just -- I hear what you're saying.
19 The statement that you make here says "the Lee Report does
20 not quantify or analyze the impact of Virgin America being
21 required to comply with California Wage and Hour Laws with
22 respect to meal and rest breaks for only intra-California
23 work/flights."  Okay?  And my question to you is, that
24 statement is inaccurate, the report does specifically have
25 analysis contained to it, limited to intra-California

Page 100

1  flights or if it's applicable to intra-California flights
2  with respect to the meal and rest break issue; isn't that
3  correct?
4         MR. KRAVITZ:  Asked and answered, incomplete.
5         THE WITNESS:  The report does have some scenarios
6  that assume intra-California flights.  I believe I am
7  trying to make my point clear here in paragraph 13 by --
8  if you continue reading after that sentence, I'm specific
9  about what I'm referring to.
10 BY MR. HENDRICKS:
11    Q.  Okay.  So just so we're clear, for example, when
12 Dr. Lee talks about the implications of not being able to
13 have flights that would involve duty periods greater than
14 3.5 hours, you understand that that would be applicable to
15 a flight that's wholly within California, as well as a
16 flight that was partially in California or wholly outside
17 of California; right?
18        MR. KRAVITZ:  Objection.  Vague.  Also, again, I
19 would ask that you allow the witness to respond to
20 questions before you interrupt him with your next
21 question, and that might help you be clear on the answers.
22        Go ahead.
23 BY MR. HENDRICKS:
24    Q.  Let me withdraw the question.
25        When Dr. Lee makes the statement that application



Page 189
1   THE WITNESS:  Yes, based on your hypothetical, I
2   understand that.
3   BY MR. HENDRICKS:
4   Q.  Okay.  So assuming that federal law does require,
5   once they are released from duty, to have an eight-hour
6   break, you would need to have a whole new set of flight
7   attendants to return that flight back to San Francisco or
8   that flight would have to wait for the eight-hour rest
9   period before another plane could go back out; correct?
10      MR. KRAVITZ:  Same objections.
11      THE WITNESS:  Those are two possible scenarios in
12  your hypothetical.
13      MR. HENDRICKS:  Let's take a break for a second.
14      THE VIDEOGRAPHER:  The time is 4:48.  We're going
15  off the record.
16      (Recess.)
17      THE VIDEOGRAPHER:  The time is 4:51.  We are back
18  on the record.
19  BY MR. HENDRICKS:
20  Q.  You understand you're still under oath?
21  A.  I do.
22  Q.  Any reasons why you now can't give your best
23  testimony?
24  A.  Not that I'm aware of.
25  Q.  Okay.  So let's continue with our hypothetical.

Page 190
1   In that situation where the flight crew, the flight
2   attendants that flew down with the flight, are unable to
3   return with the flight for the return leg, and you need a
4   whole new set of flight attendants, where would those
5   flight attendants come from?  Any sense of that?
6       MR. KRAVITZ:  Objection.  Calls for speculation,
7   lack of foundation, and outside the scope.
8       THE WITNESS:  No, I don't.
9   BY MR. HENDRICKS:
10  Q.  Isn't it likely under that scenario, assuming
11  those assumptions are correct, that Virgin would need, if
12  it intended to have a return flight that same day, using
13  the flight attendants, that they would then have to have a
14  base of flight attendants there to fly the return flight
15  back?
16      MR. KRAVITZ:  Same objections.
17      THE WITNESS:  That's possible.
18  BY MR. HENDRICKS:
19  Q.  So under one scenario, assuming that the
20  assumptions of Dr. Lee are correct, that a flight
21  attendant would be required to take their FAA eight-hour
22  mandated rest period, one of the implications associated
23  with applying California wage and hour law is that an
24  airline might need to have now bases in areas that it
25  currently doesn't have bases; correct?

Page 191
1   MR. KRAVITZ:  Objection.  Outside the scope, lack
2   of foundation, calls for speculation.
3       THE WITNESS:  I would say it's a possible
4   implication, and we would have to apply your specific
5   scenario.
6   BY MR. HENDRICKS:
7   Q.  Right.  Under that scenario, assuming that you
8   wanted to have a return flight less than eight hours of
9   time between them, you would have to have other flight
10  attendants on hand that were leaving out of that airport
11  in order to accomplish that; right?
12      MR. KRAVITZ:  Same objections.
13      THE WITNESS:  Yes, under that scenario, that would
14  be the case.
15  BY MR. HENDRICKS:
16  Q.  And then as to the flight attendants that flew
17  down in the morning, to the extent that they had to lay
18  over that day, that is to say, that was their only leg,
19  and they would be returned the following day, you would
20  need to lodge them; right?
21      MR. KRAVITZ:  Same objections.
22      THE WITNESS:  Potentially.  You're asking me to
23  make a lot of assumptions about specific circumstances.
24  BY MR. HENDRICKS:
25  Q.  That's fine, I understand that.  I'm just wanting

Page 192
1   to know whether you agree that that's a possible sort of
2   outcome here.
3   A.  I would agree that it's --
4       MR. KRAVITZ:  Let me just interpose the objection.
5   Same objections as the prior questions.
6       THE WITNESS:  I would agree that with the
7   specifics of your scenario, it's a possible outcome.
8   BY MR. HENDRICKS:
9   Q.  You would agree that to the extent that the
10  assumptions that Dr. Lee relied upon are correct, that the
11  productivity of flight attendants, the amount of block
12  time that you would be able to use in a given day, that
13  they would be able to work in a given day, would go
14  down --
15      MR. KRAVITZ:  Same objections.
16  BY MR. HENDRICKS:
17  Q.  -- correct?  Let me phrase the question
18  differently.
19      Flight attendants couldn't fly as many trips in a
20  given day as they could if California law did not apply;
21  correct?
22      MR. KRAVITZ:  Same objections.
23      THE WITNESS:  Flight attendants -- so your
24  scenario, again, is that flight attendants have to be on
25  break within four hours, and that break then has to be for



1                    REPORTER'S CERTIFICATION

2

3        I, Gina Glantz, a Certified Shorthand Reporter of the

4   State of California, do hereby certify:

5            That the foregoing proceedings were taken before

6   me at the time and place herein set forth; that any

7   witnesses in the foregoing proceedings, prior to

8   testifying, were duly sworn; that a record of the

9   proceedings was made by me using machine shorthand and

10  later transcribed into typewriting under my direction;

11  that the foregoing is a true record of the testimony and

12  proceedings taken at that time.

13       I further certify that I am not of counsel or

14  attorney for either or any of the parties to said

15  proceedings, nor in any way interested in the outcome of

16  the cause named in said caption.

17       IN WITNESS WHEREOF, I have this date subscribed my

18  name.

19  DATED:  JANUARY 16, 2018

20

21

22       

23       _____

24       GINA GLANTZ, CSR No. 9795

25